Patricia Ann MOUTAW, Petitioner-Appellant

v.

Roy Gilbert MOUTAW, Respondent-Appellee.

No. 3–880A241.

Court of Appeals of Indiana, Fourth District.

May 28, 1981.

Rehearing Denied July 22, 1981.

---

Steven W. Handlon, Portage, for petitioner-appellant.

James V. Tsoutsouris, Valparaiso, for respondent-appellee.

MILLER, Judge.

Patricia Ann Moutaw appeals from the trial court's modification of a custody decree which changed custody from her to the father, Roy Gilbert Moutaw, of the parties' son, Roy.[1]

The marriage of the parties to this appeal was dissolved on March 8, 1974. On May 16, 1974, a property and custody agreement was approved giving custody to the mother of the son and of the parties' other two children, Erika and Kristen Moutaw, and further providing the father would have reasonable visitation rights. Thereafter, on August 20, 1975, the father filed his initial motion for change in custody of all three minor children, which motion was denied by the trial court on August 28, 1975, in an order establishing an every other weekend visitation schedule.[2] The instant action was initiated by the father on May 5, 1980 by way of a second petition to modify custody, which alleged "it would be in the best interest of the children if custody of said children were transferred" to the father. After hearing, the trial court determined the father should have custody of the son, age 9, and that custody of the two girls, age 12 and 14, should remain with the mother. The court also provided the father should have visitation with the daughters one weekend per month plus holidays, and that the mother should have a similar visitation with the son.

We reverse, concluding there was no evidence of "substantial and continuing" changed circumstances occurring after the last custody proceeding between the parties which would make continued custody of the son by the mother "unreasonable" pursuant to Ind.Code 31–1–11.5–22(d), and that the cause should be remanded to permit an appropriate redetermination of the father's support obligation and visitation rights.

■ The sole issue on appeal is whether the modification decree constituted an abuse of discretion. Both prior to and after the adoption of the Dissolution of Marriage Act, Ind.Code 31–1–11.5–1 *et seq.*, the function of an appellate tribunal in an appeal from a custody modification decree has merely been to determine whether the lower court's decision is "clearly against the logic and effect of the facts and circumstances before the Court," *Campbell v. Campbell*, (1979) Ind.App., 396 N.E.2d 142, 143, a standard of review which necessarily requires this Court to look to the language and meaning of the current appropriate statute, IC 31–1–11.5–22(d), to determine whether the party seeking modification presented evidence on each element of his burden of proof. *See Whitman v. Whitman*, (1980) Ind.App., 405 N.E.2d 608. That statutory subsection provides:

1. A stay of the custody order pending the instant appeal was granted by this Court on August 22, 1980.

2. That order also gave the father three weeks' visitation in the summers, plus visitation on Thanksgiving Day and one week at Christmas, and it expressly permitted the mother to move to Brownsburg with the children.

"(d) The court [,] in determining said child custody, shall make a modification thereof only upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable. In making its determination, the court shall not hear evidence on matters occurring prior to the last custody proceeding between the parties unless such matters relate to a change of circumstances."

■ In any custody determination, the "overlying concern" of our courts is with the "best interest" of the children involved, *Whitman v. Whitman, supra* at 609. However, it is also the law that whenever one party seeks the *modification* of an existing custody determination, only the "strict showing" that the present arrangement is unreasonable will suffice to justify a change in custody, in light of its potentially disruptive influence upon the child or children. *Id.* at 611. As this Court has explained:

"When initially determining the custodian of a child in a dissolution, IC 31–1–11.5–21(a) requires the court make its determination in accordance with the best interest of the child. At that point, there is no presumption favoring either parent, the statute requiring certain factors to be considered by the trial court, all focusing on the child's welfare. Once the initial determination has been made pursuant to these guidelines, a petition seeking modification must establish a substantial and continuing change in the original conditions necessitating the modification. IC 31–1–11.5–22(d). Such strict showing promotes the stability of the child, therefore ensuring the child's best interest will be paramount."

*Id.* at 610. Evidently, such strict showing is an outgrowth of the general proposition that "a change of custody disrupts the child's living arrangements and the channels of its affection and a change in the environment of a child is ordinarily not conducive to its welfare, but is highly detrimental, . . . ." 27B C.J.S. *Divorce* § 317(2) at 542–43 (1959). Thus, this Court has concluded with respect to our own statute, "the Indiana legislature sought to discourage modification attempts, perhaps 'because of the extent to which former spouses use the modification process repeatedly for vexatious purposes only." *Lovko v. Lovko,* (1979) Ind. App., 384 N.E.2d 166, 171, *quoting Covalt v. Covalt,* (1976) 171 Ind.App. 37, 45, 354 N.E.2d 766, 771.[3]

■ As we have previously indicated, the father's petition to modify custody did *not* allege there had been any change in circumstances—whether substantial, continuous, or otherwise—but rather represented merely that it would be in the children's best interest if he were made the custodial parent, a claim which on its face does not comport with the showing required by our Legislature in order to modify custody. Since it is apparent, however, that the trial court's order may have been based on appropriate evidence which was elicited at trial, our analysis proceeds to consider the findings which were made and the evidence, if any, supporting them.

The court's formal entry indicating ultimate factual determinations (rather than basic underlying facts) was as follows:

"The Court bases its decision on the support and custody modification pursuant to Burns Indiana Statute 31–1–11.5–21.

The Court specifically bases its decision upon the following findings.

**3.** It was concluded, however, in *Lovko* that the strict modification standard was inapplicable where the trial court had originally ordered only a "temporary" custody arrangement pursuant to the parties' settlement agreement. In the instant case, in contrast to the settlement agreement in *Lovko,* where custody was only provisionally given to the husband subject to a later review at a specified time, the original agreement between the parties gave the wife

custody of the children, and "full control and supervision of their care, guidance, maintenance, medical care, education and right to determine their place of residence until they are emancipated subject to the following order of the court." Such custody by the wife was continued by the court's order of August, 1975, denying the husband's first modification petition.

1. The wishes and decisions of the three minor children. The Court specifically took quite some length of time in discussing this matter with them.

2. The Court specifically finds that the present alternating weekend schedule is not satisfactory to the three minor children, not [sic] the parents, mainly because of the distance involved between Valparaiso and Brownsburg. The Court specifically found that the father had not been adequately and sufficiently informed and updated as to the minor children's life and well-being; and had been somewhat deprived of an opportunity to develop a working parental relationship with his son and daughters.

3. Court specifically finds that this has been somewhat detrimental to the son's upbringing and welfare. Court specifically further finds that the son does desire a closer and better relationship with his father. Court specifically finds that all three minor children will ultimately benefit with this new custody and visitation order, and there will be ample opportunity for all three children to have an inner-relationship with each other and with their mother and father. The Court specifically finds that the two daughters have indicated that they wish to have this type of liberal visitation that is spelled out in this order. However, because of the oldest girl, Erika, the Court makes this order concerning her visitation subject to her consent. If she does not wish to visit with her father, she should so indicate this to him."

Apparently unintentionally, the court's order was expressly founded on the provisions of IC 31–1–11.5–21,[4] the statute pertaining to *initial* custody determinations (and in this sense such order was consistent with the husband's failure in his petition to allege a substantial change of circumstances), although the language of the order was later amended "to reflect that the Court's findings which were entered into the July 3rd order were findings that were substantial and continual and that these chain of circumstances accumulated in making the original custody order for the minor boy of the parties unreasonable."[5]

In support of the order, the following evidence was elicited at trial: Although both parties evidently lived in Valparaiso, Indiana, when the marriage was dissolved and custody given to the mother, at some time "shortly" thereafter, the mother moved to Brownsburg, Indiana, a distance requiring approximately two and one-half hours' traveling time. Significant to his contentions in the instant appeal, the father concluded such act "could be" and "most likely was" viewed by the trial court as an effort, after the move was accomplished, to destroy his relationship with the children. After the move, the mother acknowledged she had left visitation arrangements "up to the children" or "up to the children and their father" on at least one occasion (during the summer), and that she had failed to notify the father of the son's baptism. The father also testified, however, the mother was responsible for "getting them [the children] involved" in various social and sports programs which would conflict with his court-ordered visitation. In this regard, the father speculated the mother's "new" job had caused the son to become involved with the sports and social activities so he would not have to go home "where there is no one home until 5:00 or 6:00 or 7:00 at night," although the mother asserted, by contrast, that her father (who lives in the same house) is present when the children come home from school. The specific evidence of alleged interference with the father's visi-

4. That statute provides in part,

"(a) The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there shall be no presumption favoring either parent . . . ."

Under the statute, the various factors to be considered by the court in making its determination include the age and sex of the child and his or her wishes, plus significant relationships between the child and his or her parents, siblings, or others, the child's adjustment to home, school, and community, and the mental and physical health of all individuals involved.

5. The findings themselves were not modified, and no additional findings were made.

tation consisted principally of his testimony that during the summer of 1979 he had "extended visitation" of only 10 days with the daughters, and that "[w]ith my boy I didn't have any . . . . [j]ust the weekend, Saturday and Sunday" for the entire summer,[6] despite the existing court order of August, 1975 giving him visitation for three consecutive weeks during the summer in addition to every other weekend, and that on a couple of other occasions there was a "constructive denial" of his visitation. According to the father, such "constructive denial" of his summer, Thanksgiving Day and Christmas visitation periods was caused by a variety of factors, including the wife's refusal to consider alternate arrangements, his own desire not to "put a damper" on plans which had been made, travel difficulties (unspecified) on Superbowl Sunday, the son's baseball and football programs, and the oldest daughter's similar activities, with respect to which the father stated, "I never demanded to see her when those activities conflict." Other evidence of "constructive denial" of visitation also included the father's statements that on "two or three" occasions during the year he had to both pick up and return the children (once because the mother was taking an exam to become an accountant), that the mother would never call him until "right before" she intended to pick them up, that she had failed to abide by a "private" agreement between the parties to allow him to be with the children over half of their spring break and that he had never had the children on Thanksgiving, despite the express provision regarding that holiday in the court's order of August, 1975 denying his first petition to modify custody.

The father also gave self-serving hearsay testimony that in March of 1980, his son had asked to live with him, that the son stated "he was sure" in response to questions by the father several weeks later, and

that the father wouldn't have filed his petition to modify custody "unless he [the son] would have asked me." In his brief, he asserts the son "undoubtedly" still desired to live with his father at the time of trial, and that "evidently" he so informed the trial judge. The father similarly testified one of his daughters had made the same statement in August of the previous year, although she had not repeated her request since then.

As regards the living arrangement of the parties, and their general home environments, the evidence reveals both parties were able to provide physically adequate homes. The trial court concluded "the only evidence that's been [presented] here is that both places, as far as I can understand, are decent homes." The father testified he and his new wife, who he married in May of 1979, live in a five-bedroom house in a "new subdivision," and that in addition, there is a boy the son's age who lives across the street, and at least twelve children within a six block area that are "within one (1) year either way that he could be friends with." He stated the children get along well with his current wife. In addition, the father also testified he recently had obtained a law degree which enabled him to supplement his income as a policeman by approximately $2,000 in 1979, and by the same amount in the first six months of 1980. The mother testified she lives with the children and her parents in a five-bedroom home "situated on approximately ten acres of real estate, including a large pond," and presented evidence the son had done well in school and had received a perfect attendance award during the last academic year.

In viewing such facts, we are cognizant that even prior to our present custody modification statute, quoted *supra*, the law in Indiana was well established that any modification of a custody order must be based upon a change of circumstances occurring

6. It was unclear from the father's testimony whether he meant by this he had no extended visitation *with his son in addition to the regular* weekend visitation or whether he had seen his son only on one weekend. In this regard he testified, "Last summer my son was in a base- ball program. His baseball program ended on Saturday and his football program started on Monday, so I saw him for one weekend when he wasn't involved in something for the whole summer, when I was supposed to have him for three weeks."

after the initial custody order "which renders the contemplated change *necessary for the welfare of the child,*" *Partridge v. Partridge,* (1971) 257 Ind. 81, 86, 272 N.E.2d 448, 451 (emphasis added) and that a change would not be permitted where it was intended simply for the convenience and benefit of the parents. *Id.* In *Partridge,* where our Supreme Court reversed a modification giving partial custody to the father because he had moved to Kansas, it was accordingly held there was no evidence warranting such a change, since

> "[i]n the case at bar the only change of circumstance alleged and established by the evidence is that the father no longer resides in the State of Indiana. *Although without any question there is a benefit to the child to be able to visit with his father, there is no evidence in this record to indicate that this three-year-old child will benefit by being removed from his mother's home* for periods totaling eight weeks during a calendar year. There is no evidence of any change in the mother's ability to provide proper custody for the child since the entering of the original decree. *Looking to the evidence most favorable to the appellee, we find the sole reason for the change of custody was for the convenience and benefit of the appellee.*" (Emphasis added.)

*Partridge v. Partridge, supra* at 86, 272 N.E.2d at 451.

In the instant case, we similarly conclude there also was no evidence of a substantial change making the earlier custody order "unreasonable," IC 31–1–11.5–22(d), *supra,* although it may be true, as the trial court found, the son of these separated parties has been "somewhat deprived" of a good relationship with his father,[7] and both parents have been inconvenienced by the long distance visitation occasioned by the mother's move. Presumably, dissolutions of marriage will often be "somewhat detrimental" to a child's upbringing and welfare, although, fortunately, the "somewhat detrimental" standard is not the test in this State governing custody modifications.

In essence what the father did establish is simply this: Quite predictably, in light of the mother's move to Brownsburg, the visitation arrangement had become inconvenient, and in addition to this (but also inevitably) his children had become older and developed new interests. The father did not deny his own commendable part in fostering these new interests, even at the expense of his visitation. He admitted, for example, he did not insist upon seeing the children when it would "put a damper" on their plans, and he also conceded any alleged denial of his visitation rights was merely "constructive." Such evidence does not suggest the mother's custody was "unreasonable," even when combined with the father's speculation a 10–year old boy needs a paternal influence other than a live-in grandfather. The father also hypothesized his son "undoubtedly" still wanted to live with him because at one point he had expressed such a desire, although there is no reason to suppose that evidence, if credible, would *necessitate* a change in custody from the mother.[8] Other evidence submitted by the husband was similarly speculative and inconsequential on its face, in light of the standard that a change in custody must be

7. Arguably, however, it may also be the case that the son's relationship with the father was in fact improved by the latter's acquiescence in the son's desire to participate in sports activities which would sometimes conflict with the visitation.

8. We note in this regard the findings of the trial court quoted above, where it is stated the court considered "[t]he wishes and decisions of the three minor children" in making its decision, although it is not specifically indicated what those wishes were. Interestingly, the record of this case reveals an affidavit by the trial judge filed in response to affidavits by the children accompanying the wife's Motion to Correct Errors in which it is stated "[t]he main purpose of interviewing the three minor children was to ascertain their feelings concerning future visitation with their noncustodial parent," and that "after hearing all the evidence in the case, the Court had pretty well decided the custodial questions that were eventually decided in this case." It was also stated in the judge's affidavit "[t]hese questions were decided from the evidence in the case *prior* to the Court's interview with the three minor children." (Emphasis added.)

necessitated by substantially altered circumstances. He asserted, for example, without supporting evidence, the children probably became involved in activities to avoid going home to an allegedly empty house, and that the wife's move to Brownsburg "most likely" was viewed by the trial court as an effort to disrupt his relationship with the children. In fact, as noted earlier, the trial court had specifically approved the move in its August, 1975 order, when the father's first petition to modify was denied. In this regard, it is evident the mother's move was not even a "changed circumstance" with respect to the earlier custody order.[9] *See* IC 31–1–11.5–22(d), *supra*, where it is stated the court shall not hear evidence involving matters occurring prior to the last custody order unless they relate to a change of circumstances, *and see, e. g., Brickley v. Brickley*, (1965) 247 Ind. 201, 210 N.E.2d 850, applying a similar evidentiary restriction even prior to the enactment of the current modification statute.

Having failed to show why a custody change was *necessitated*, the father in the instant case, like the one in *Partridge v. Partridge, supra*, in effect established only that it would "benefit" the son to be with him, without presenting evidence of the "benefit" or other consequences attendant upon removing him from his present home. The result, quite obviously, is that the trial judge's Solomonic effort to improve a "somewhat detrimental" situation with re-

spect to the father has succeeded in slicing the family into even smaller fragments than before, separating the son not only from his mother, but from his sisters as well. Presumably, in light of the various activities of the children the son may not even see his sisters for weeks or months at a time under the one weekend per month visitation schedule established by the judge for both the mother and father.[10] How, if at all, such an arrangement is necessary to the welfare of the son and the daughters does not appear in this record.[11]

■ Thus, we conclude the evidence was wholly lacking to establish the unreasonableness of the initial custody arrangement using the appropriate best interests of the child test. Rather, it is clear the evidence only supported (as the trial court could have determined) the conclusion that the previous visitation schedule was not working as anticipated. While such finding would not justify a change in custody, it would support a modification of visitation pursuant to IC 31–1–11.5–24, which provides in part "[t]he court may modify an order granting or denying visitation rights whenever modification would serve the interest of the child; . . . ." *See generally Chance v. Chance*, (1980) Ind.App., 400 N.E.2d 1207, 1210, where the Court stated, "[o]nce it is shown the orders do not operate as intended, history, experience, and human nature show that a trial court should amend the

---

**9.** The father also failed to show on what dates other alleged significant changes occurred—such as the mother acquiring her "new" job, an alleged antagonism between the parties, and the father acquiring his "new" house—and thus did not meet his statutory burden with respect to these facts, assuming *arguendo* they might possibly be evidence of situations occurring subsequent to the previous order necessitating a change of custody.

**10.** For instance, the daughters and son may both visit their respective noncustodial parents on the same weekend, or on occasion, because of conflicts or illness, a visitation might be missed.

**11.** Nor, for that matter, does the husband suggest how a change in custody would reduce the alleged, but unproven, "antagonism" between the parents, although the father cites, in this

regard, *Needham v. Needham*, (1980) Ind.App., 408 N.E.2d 562, 564, where the Court stated:

"[I]t is apparently the trial court's determination that the change of custody will substantially diffuse the harm that is being caused to the children by reducing the amount of exposure to the mother and providing a more stable environment."

In the instant case, where the trial court made no finding of antagonism and in addition concluded that both homes were suitable and that "[t]here's nothing wrong with the way his mother's been raising him [the son]," there was no evidence of "unpleasant 'scenes' " as in *Needham*, of attempts by the mother to "poison " the father in the children's minds, or any other evidence of an unstable environment causing the children "psychic harm." *Needham v. Needham, supra* at 564.

decree to specify the visitation rights in detail as to terms, places, and circumstances."

The order of the trial court modifying custody of the son is reversed, and the cause remanded to permit a redetermination, if appropriate, of the father's visitation rights and support obligations.

YOUNG, P. J., and CHIPMAN, J., concur.