Mildred ELBERT, (Now Middy True), Appellant,

v.

Stephen ELBERT, Appellee.

No. 31A04–8910–CV–444.

Court of Appeals of Indiana, Fourth District.

Sept. 30, 1991.

John R. Garry, Jr., New Albany, for appellant.

Richard R. Fox, Fox & Cotner, New Albany, for appellee.

MILLER, Judge.

Mother Middy True appeals the denial of her petition to gain custody of her son, Jason (eight years old at the time of the hearing), from father Stephen Elbert with whom the child had lived for seven years since the divorce. She claims the trial court abused its discretion when it refused to change custody and improperly relied on religious factors to deny her custody. She also claims the court abused its discretion in ordering her to pay child support and to be responsible for all costs of transportation for her visitations with Jason.

Stephen requests appellate attorney's fees, claiming that Middy is pursuing this appeal for purposes of harassment, and that while this case was pending on appeal—and the trial court was allegedly without jurisdiction to take any action—she obtained an *ex-parte* order from the trial court relieving her of the responsibility and expenses of transportation for the child.

At the outset, we want to make clear that we are affirming the trial court's decision to deny a change of custody because Middy failed to present evidence there had been a substantial and continuing change in the custodial home which was detrimental to Jason in any way. However, there is merit in Middy's claim that the trial judge overstepped his authority 1) in interrogating Middy and her husband in regard to their church attendance and, 2) in his order, by expressing his religious requirements for a custodial parent. Had Middy presented substantial evidence on her behalf sufficient to permit the judge to exercise his discretion to change custody—which she did not do—we might have been faced with a judgment that was tainted, requiring a new trial. We also find that Stephen waived the issue of appellate attorney's fees—on the basis of harassment—by his failure to supplement the record in accordance with our appellate rules.

## DISCUSSION AND DECISION

Middy and Stephen Elbert were married on August 21, 1976, and divorced on July 23, 1980. The custody of their one year-old son, Jason, was awarded to Stephen pursu-

ant to a settlement agreement. In May, 1984, Middy filed a petition to modify the decree to obtain custody or expanded visitation rights. Her request for custody was denied, but visitation rights were expanded. In September 1986, she married Vance True, a chiropractor in Danville, Kentucky.

After the divorce, Stephen continued to reside in Corydon, Indiana, where he had lived all of his life. Corydon is approximately 110 miles from Danville. At the time of the hearing, he lived in an older home in Corydon which he had remodeled. The house is four houses away from the home of his parents. Jason has a good relationship and enjoys many activities with Stephen's parents. The Corydon home has an acre of play area including a baseball diamond and a basketball goal and Jason has lots of friends in the neighborhood. Middy has relatives in the area who on occasion pick up Jason for visits.

Since the divorce, Stephen, who had always worked in construction, started his own business and remarried. Jason has a good relationship with Stephen's wife, Rhonda. Rhonda has a daughter (11 years old at time of hearing) from a former marriage and Rhonda and Steven had a baby, Shane (age four at the time of the hearing). Jason shared a bedroom with Shane; however, Stephen planned to build a new house with a separate room for each child.

Middy filed a petition to modify on June 26, 1989, based on a change in "her circumstances" which "would allow her to provide a more stable and secure home for Jason: emotionally, physically, and financially." Appellant's Brief, p. 6. A trial was held on August 24, 1989, on her petition and on Stephen's counter-petition requesting support. The court found there was "no reason to change custody." (R. 41). However, the court modified the support order by requiring Middy to begin paying twenty-five dollars per week support for Jason and modified her visitation rights (because of the distance she lives from Jason) by expanding her visitation periods and requir-

ing her to be responsible for the transportation of Jason for visitations. However, the order included a contingency provision that "if [Middy] shall become pregnant, she is allowed to file an *ex-parte* motion and obtain an order requiring [Stephen] to be responsible for said transportation if her doctor determines that she cannot drive for long distances".[1] (R. 42).

*I. Did the trial court abuse its discretion in denying custody modification?*

Middy recognizes that in an appeal from a refusal to modify custody, this court will only reverse where the trial court's decision is clearly against the logic and effect of the facts and circumstances. The non-custodial parent bears the burden of a "strict showing" that the present custody arrangement is unreasonable. *Moutaw v. Moutaw* (1981), Ind.App., 420 N.E.2d 1294; IC 31–1–11.5–22(d). On appeal, she claims the court's decision was clearly against the logic of the evidence presented in that:

1) both parents wanted Jason, but that Jason wanted to live with his mother. The court stated that he had talked with Jason and that he wanted to live with his mother.

2) She had not been kept informed of Jason's life and well-being and that she had been deprived of an opportunity to develop a parental relationship with her son.

3) Steven interferes with her relationship with Jason and attempts to discredit her in front of him.

4) She has more time to spend with Jason, has a nice home, and was at the time of the hearing in the process of "building an even nicer one" adjacent to a golf course, with a pool and tennis courts.

5) Her husband is financially secure and she would not ask for any support if she were granted custody.

 The trial court is vested with broad discretion in custody determinations. While there may have been changes in Jason's life since the original custody order was entered, these changes do not auto-

---

1. We presume this contingency provision would only be in effect during her pregnancy and for a short period following childbirth.

matically justify a change in custody. *Walker v. Chatfield* (1990), Ind.App., 553 N.E.2d 490. At the initial custody determination, the trial court presumes that both parents are equally entitled to custody, but determines which parent would be the better choice. *Id.* In a subsequent petition to modify custody, the noncustodial parent bears the burden of overcoming the custodial parent's right to continued custody. *Id.* Continuity in custody is a key element in determining what is in the best interests of a child, *Dunlap v. Dunlap* (1985), Ind. App., 475 N.E.2d 723, and, only a strict showing that the present arrangement is unreasonable will justify a change in custody because of the potentially disruptive influence upon the child. *Walker, supra; Gerber v. Gerber* (1985), Ind.App., 476 N.E.2d 531. As an appellate court, we do not weigh evidence nor judge credibility of witnesses, *Barnett v. Barnett* (1983), Ind. App., 447 N.E.2d 1172, and, in determining whether the trial court abused its discretion, we consider only the evidence which supports the trial court's decision. *Smith v. Dawson* (1982), Ind.App., 431 N.E.2d 850.

Middy, as the petitioning party, had the burden of proving that material changes of a significant, decisive, and ongoing nature warranted a change of custody. In her petition to modify, she claimed:

1) She married a chiropractor and moved to Danville, Kentucky, over two hours away, making visitation difficult;

2) Stephen and his wife work, requiring day care for Jason, but she does not work and can care for Jason full-time;

3) Stephen acts in bad faith in regard to her visitation;

4) Jason must share a bedroom with his four-year old step-brother whereas she can provide him with a room of his own;

5) Jason's grades have fallen.

With regard to Middy's first claim, our courts have held that a move by the noncustodial parent which makes visitation inconvenient is not sufficient to warrant a change in custody. *Moutaw, supra,* citing *Partridge v. Partridge* (1971), 257 Ind. 81, 272 N.E.2d 448.

The record indicates Stephen works long hours in his business; however, there was no evidence that Jason has been affected in a detrimental way. Stephen admitted that he did not have as much time to spend with Jason as he would like due to the demands of his business—on the other hand, Stephen had managed to coach Jason's soccer and baseball teams (quality minutes). Before the hearing, Stephen's wife quit her job to work full-time at home handling the bookkeeping and other matters for Stephen's business, which means that she will be at home to care for the children. The record also reflects that Jason's grades did fall during the fourth grade, but the principal at Jason's school testified that this was a common occurrence because the teachers imposed a stricter grading system beginning in the fourth grade. The principal also testified that Jason was a well-adjusted, outgoing, happy child. Stephen testified that it is difficult to raise three children from different marriages, but that he and Rhonda try to treat each child equally and that both he and Rhonda have a close relationship with Jason. Stephen also testified that he felt Jason would like to live with his mother because of the "things" which Middy can provide—a bedroom with his own telephone and television which he doesn't have to share with another child. Although the testimony indicates that there have been occasional breakdowns in communication regarding visitation, there is no evidence to support Middy's allegation that Stephen deliberately interferes with her visitation rights. In fact, Stephen had encouraged the development of Jason's relationship with his mother by permitting Middy additional periods of visitation not required by the court order. Thus, there was a total lack of evidence to support any *detrimental* changes in Stephen's home or relationship with Jason.

Middy also claims as a basis for change that her financial position is now better, she wants the child, and he wants to be with her. This court has consistently held that changes in the status of the *noncustodial* parent—as is the case here—are not sufficient to modify custody. *Pribush v.*

*Roy* (1983), Ind.App., 456 N.E.2d 747; *Drake v. Washburn* (1991), Ind.App., 567 N.E.2d 1188, *trans. denied,* (filed August 22, 1991, Dickson, J. dissent to denial of transfer, Krahulik, J. concur). Additionally, Jason's wish to be with his mother, absent any evidence that the existing custody order is unreasonable, is insufficient to support a modification of custody. *Id.*

The circumstances in *Pribush, supra,* were very similar to those of the present case. There, Mother had been awarded custody in a Kansas divorce. Mother moved to Indianapolis, remarried, and the child was integrated into the new family. Both Mother and step-father were professors at local universities. The nine year-old child lived in a normal, positive family atmosphere and was active in sports and Cub Scouts. The Father, a regular Army officer, had regular and rewarding visitations with the child after he remarried and his military status changed to a permanent assignment teaching at a Military Junior College in Pennsylvania. Father petitioned for a change in custody based on the changes in *his* status and the fact that the child expressed a desire to live with him. The trial court granted the change, but this court reversed because Father, despite the improvement in his ability to provide a home for the child and the child's expressed desire to live with Father, had not met his burden of proving that changes in the conditions in the custodial home or in the treatment of the child in the custodial home necessitated a change in custody.

In *Walker, supra,* we observed that children of separated parents often believe living with the other parent will make them happier—particularly where there is some jealousy of step-siblings or unhappiness with a step-parent. Changing custody *solely* on the basis of a young child's desire to live with the other parent could lead to instability in the child's life—once the child became dissatisfied with that parent, it could become the basis of yet another custody change. As a matter of law, a young child's whim to live with one parent can not be the "substantial and continuing" change required by statute because the child's wishes are subject to frequent changes and can be easily manipulated by a parent seeking to gain custody.

In summary, Middy did not show that Stephen was unfit or that any changes in the custodial home have affected Jason in any detrimental manner. Despite Jason's desire to live with his mother, she did not meet her burden of proving the present custody arrangement was unreasonable or that a change in custody was necessary for Jason's welfare. We must say that the trial judge had no other choice than to sustain the original custody order.

*II. Did the court improperly rely on religious matters to deny Middy custody?*

Despite the fact that Middy, Stephen and both step-parents are Roman Catholics, Middy argues the trial judge was biased against her, and the court's actions and holding are unconstitutional because the judge relied on religious factors to deny her custody. In order to find she was denied custody because of religious factors, we would have to find Middy had met her burden of proving there was a reason to change custody and, that having met her burden, the court denied her custody because of religious practices—here, the failure to take Jason to church. As we discussed in Issue I, Middy failed to meet her burden of presenting *prima facie* evidence that a substantial and continuing change necessitated a change in custody and, thus, she is not entitled to a reversal or a new trial.

 However, Middy's claim—that the judge infringed upon her right to practice her religious beliefs as she chooses—deserves further discussion.[2] The subject of

---

2. Middy did not object to the court's questioning of her and her husband at trial and raises the issue for the first time on appeal. An appellant can not sit idly by without objecting, await the outcome of trial and, thereafter, raise an issue for the first time on appeal. *In the Matter of the*

*Commitment of Cheek* (1991), Ind.App., 567 N.E.2d 1192.

She also asks this court to find statutes and case law dealing with child custody issues unconstitutional. She contends they permit courts to become entangled with the noncustodial par-

religious training was introduced into the hearing when Middy claimed Stephen tried to discredit her in front of Jason by commenting on the fact that she did not attend church every Sunday. Specifically, she stated:

> "[W]hen you're sitting there telling an eight year-old that it's a sin not go to church every Sunday, and I'm not doing it, and he knows his grandmother's not doing it. There's a lot that a child has to try to go through his mind, and I think it is a discredit."

(R. 74–75).

Middy claims that Indiana statutes and case law giving the custodial parent the right to determine the religious upbringing of the child permit the custodial parent to use differences in religious practices or beliefs to form a barrier between the noncustodial parent and the child. She cites as an example the above comments she alleges were made by Stephen. We do not find these comments necessarily indicate Stephen deliberately attempted to discredit Middy or to raise barriers between Middy and Jason. The comments—which may have been taken out of context—could merely state his opinion or beliefs. It is clear that by word or deed, a parent provides children with a foundation of values and beliefs. When parents divorce, there are frequently differences in lifestyle—religious or otherwise. If one parent comments on these lifestyle differences, it may or may not be for the purpose of discrediting the other party. Of course, these differences could be used by a vindictive parent to denigrate the other parent. While

we do not approve of such behavior, it is not the function of the court to resolve such problems unless it threatens the welfare of the child.

 Even if the comments indicated some misconduct on the part of Stephen, it would be insufficient to merit a change of custody. A noncustodial parent must show more than isolated acts of misconduct by the custodial parent to warrant a modification of custody. *Pea v. Pea* (1986), Ind. App., 498 N.E.2d 110, *trans. denied.* We also observe that Stephen's comments were ineffective in denigrating Middy—if that was his intent—because Jason apparently wanted to live with his mother.

 Additionally, Middy testified that, if she were granted custody, she would continue Jason's religious training. When the judge questioned Middy, she acknowledged that, during a modification hearing in 1984, Stephen asked her to take Jason to church when she had visitations. She admitted she had not done so. The judge questioned Middy and her husband, Vance, as to how often they attended church and each admitted their church attendance had been irregular. The judge asked them why they had not taken Jason to church during their visitation periods and was critical of their lack of regular church attendance. He suggested that their promise to take Jason to church if they were granted custody had to be taken with a grain of salt since they had not done so in the past. (See Appendix at end of this opinion for questioning by the judge.) In his closing

---

ent's right to religious freedom and she argues she is entitled to a review of this matter as fundamental error. She asks this court to find Ind.Code 31–1–11.5–21(b) unconstitutional. It provides for the custodial parent to determine the child's religious upbringing. She also asks us to overrule *Overman v. Overman* (1986), Ind. App., 497 N.E.2d 618, which relies on the statute. Additionally, she asks this court to find IC 31–1–11.5–22(d) and IC 31–1–11.5–23(c) are unconstitutionally vague. IC 31–1–11.5–22(d) provides that the court shall modify custody only upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable. IC 31–1–11.5–23(c) provides that "the court without a jury shall determine questions of law and fact."

We decline to address the constitutionality of these statutes because Middy has waived the issue by inviting the error, *Associates Investment Co. v. Claeys* (1989), Ind.App., 533 N.E.2d 1248, and by failing to make an objection at trial, *Azimow v. Stoker* (1960), 131 Ind.App., 195, 166 N.E.2d 887. Constitutional errors are not necessarily fundamental errors and may be waived if not properly preserved for appeal. *Cheek.* Furthermore, if the trial court's judgment can be affirmed on any statutory or common law basis, the constitutional questions will not be reached. *Bayh v. Sonnenburg* (1991), Ind., 573 N.E.2d 398.

remarks, he expressed his personal opinion that it was important to formalize one's religious beliefs through church attendance and questioned the sincerity of their beliefs—suggesting (but not stating) that they were not "real" or "good" Catholics because they did not find it necessary to formalize their religious beliefs through church attendance. The continued questioning by the judge on this subject caused the Trues' attorney to inform the court he would have advised his clients to alter their behavior had he known the judge felt so strongly about this issue.

At the end of the hearing, the judge found:

"First of all I have no doubt that the mother and father as well as the step-mother and the step-father love this child and he's a very lovable child. I've talked to him. And he wants to go with his mother. I understand that. The problem I have with these hearings is to take the child away from the father I have to have a reason for taking the child away from the father. I can't—or if this child was with the mother I have to have a reason for taking the child away from the father. I do not feel that there is sufficient reason. Maybe his grades—C's—are not the best grades that we would like, but the Principal has explained the grading system and I have to accept his explanation. The child is not getting the financial care that he probably, uh, the financial contribution that he would get in the mother's home; that's true, but I will have to also say that I can't, I don't believe in changing custody based solely on monetary considerations. If that was the basis, if the child were

with the mother and the father were making a lot of money and he came in here and he said my child would be better with me because I can provide more for him, all I'd have to do is take a little bit more away from him and give it to the mother for support and that would even it up. So that is not a basis for changing it. And I will have to also say this, *no matter what the religious training of the child would be, whether he was Catholic or Protestant or Jewish or Moslem, whatever he was, he deserves to have a continuation of that religious teaching, and that religious teaching takes place not only in the home but it also takes place in formal training at the church. I can't, I do not believe that what has been told by me by the mother and the stepfather would indicate to me that they have in the past gone to that extent to assist the child in that religious upbringing and it does not warrant me believing that they would do it in the future.* But that is not the major consideration. The major consideration is whether or not he was being ill cared for by the father. I cannot say he is. I cannot say he is. And therefore I'm going to deny the mother's petition for change of custody."

(R. 197–198, emphasis added).

We recognize that a trial judge has a most difficult task and, thus, comments are made in the course of a hearing which a judge might not say if he had time to reflect and choose his words more carefully. In fact, by addressing the judge's comments on religion, this court runs the risk of falling into the same trap of impermissibly expressing our opinions or views on religion.[3] If this had been an initial hear-

---

**3.** This judge placed an emphasis on the importance of "formalizing" one's religious beliefs through church attendance. If that were a proper factor in custody decisions, many individuals would be in danger of losing custody or of being denied custody. In 1989, only 58.7% of the population of the United States belonged to any church, including all religions—Protestant, Catholic, Jewish, Buddhist, Moslem, and others. *The 1991 World Almanac, Book of Facts* (1990), Pharos Books, p. 610. An even smaller percentage attend church regularly. *Id.,* citing a Gallup poll taken January 1, 1990 (Question: whether

or not the respondent had attended church services within the past seven days. Response: 43% of adults; cf. 57% of teenagers).

Surveys conducted by the Gallup Organization for the Princeton Religion Research Center indicate that the "vast majority" of Americans believe it is possible to be a good Christian or Jew without going to church or synagogue. The surveys also reveal a trend toward a "decoupling" of belief and practice and a "privatization" of faith. One major impact of this trend is the growth of the religiously unaffiliated and the unchurched, which includes people who

ing, where both parents are presumed to be equally entitled to custody, we might find the judge's questions and comments so prejudicial as to merit reversal.

The Supreme Court reminded us that a state may not condition the receipt of an important benefit upon conduct proscribed or mandated by a religious faith "thereby putting substantial pressure on an adherent to modify his behavior ...;" neither should our judicial system be used to express skepticism of an individual's beliefs *or preference for a certain manner in which a religious belief is practiced.* *Thomas v. Review Board of Ind. Employment Sec. Div.* (1981), 450 U.S. 707, at 717–718, 101 S.Ct. 1425, at 1431–1432, 67 L.Ed.2d 624. *See also Center Township v. Coe* (1991), Ind.App., 572 N.E.2d 1350 (requiring attendance at church services to receive a statutory benefit—shelter—violates freedom to believe as individual chooses). Thomas, a Jehovah's Witness, was denied unemployment benefits when he quit his job at a foundry because the work he was assigned was related to the production of weapons. He asserted that he could not participate in such activity without violating the principles of his religion. A co-worker, who was also a Jehovah's Witness, advised him that working on weapon parts was not "unscriptural," but Thomas was not able to agree with his friend's interpretation. The Indiana Supreme Court, overturning this appellate

court's reversal of the Board's decision, held that Thomas had quit voluntarily for personal reasons and, therefore, did not qualify for benefits. In reversing, the Supreme Court observed that our supreme court had given significant weight to the fact that another Jehovah's Witness found work on tank turrets 'scripturally' acceptable. The Supreme Court made the following observations which are applicable here where both parents are Catholic but have different ideas on how to practice their faith:

> "*Intrafaith* differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly *ill equipped* to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. *Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.*"

*Id.* 450 U.S. at 715–716, 101 S.Ct. at 1430–1431, (emphasis added).

Here, the judge expressed a preference for practicing religious beliefs through church attendance.[4] The judge made his beliefs and standards known, and attorneys

---

claim church membership, but rarely if ever go to church. Gallup, *Looking Ahead to the Year 2000,* Religion in America—1990 Report, (1990), p. 8.

**4.** The two concurring judges disagree with this author's opinion that the judge went too far in his questioning of Middy and her husband about their religious practices. See Judge Baker's concurring opinion. As noted earlier, we have included an Appendix at the end of the decision which contains the questioning by the judge.

The concurring judges view the trial judge's comments as a natural response invited by Middy's introduction of the issue of the child's religious training. It is a reasonable response for the judge to question how he could believe that Middy and her husband would continue the child's religious education if she were granted custody when she hadn't taken him to church in the past. But, in the opinion of this writer, his

comments at the end of the hearing (highlighted above, slip op. 13–14) were a gratuitous expression of his opinion of how a parent should provide religious education for their children. The First Amendment, as well as our own constitution, prohibits entanglements with matters relating to religion; hence, the state may not promote any religion, nor require church membership or regularity of church attendance, nor require religious training in any faith. The Constitution also prohibits states from designating—either before or after custody determinations—any religion or the manner in which religious doctrine is practiced. Here, the trial judge—representing the state—set religious guidelines. In my opinion, even if the judge stated that church attendance was not very important or that it was not necessary to formalize one's religious faith in any particular manner, the comments would have still been impermissible—an unnecessary entanglement of the state in religious matters.

who practice in his court may fashion their cases and advise their clients to alter their religious practices—or their representation of their practices—to conform to this judge's guidelines for raising children in their religion.[5] Furthermore, having expressed his guidelines on the religious upbringing of children, he may—just as any other judge who makes a public record of his opinions—have invited a challenge to his qualifications to serve in a custody proceeding (either the initial one or a modification) where one of the parties realistically perceives that the other parent's beliefs more nearly fit the judge's guidelines.

Many intangibles are involved in a judge's determination to favor one parent over the other and—in a close case—knowledge of the judge's personal standards could be used to sway the judge to prefer the parent whose practices—or representation of those practices—mirrors the judge's guidelines.

■■■ However, in the present case, although some of the these comments by the trial judge in connection with the custody award may be unfortunate, we can only reverse for an abuse of discretion where the trial court's custody determination is based on an erroneous *conclusion* which is

---

**5.** See Appendix and note the questions John Garry (Middy's attorney) directed to Middy's husband, Vance, and Garry's comments to the judge:

*Questions to Vance*

"Quite frankly, we didn't talk much about the religious aspect of it, but if I, if you had known that the Judge was going to take an interest in this, and rightfully so, and that this case may turn on whether or not you took Jason to church on Sunday, would you have taken him to church on Sunday all of the times that you were with him?"

\*　\*　\*　\*　\*　\*

"We may have perhaps, as your attorney, and I, we may have perhaps underestimated the importance of this, but now that we know how important it is and the desire that you and Middy have for having Jason live with you, there is no chance is there that you will not see that this young man gets to church every Sunday and gets to religious schooling?"

\*　\*　\*　\*　\*　\*

*Comments to the court*

"I guess, Judge, I've been a little remiss in that from the initial interview on I've mentioned this but I didn't give it maybe the proper, in my discussions with them maybe I didn't give it the proper emphasis that I should have given." (R. 112–115).

After these comments were made, the judge explained that the child's religious training was not that important to him, but it was important to the custodial father, who had the right to determine the religious upbringing of the child, and he was merely attempting to carry out the father's wishes. Nevertheless, the judge did express his opinion that formal training in the church was important and once the child had begun religious training in a particular faith, it should be maintained.

This case is unlike *Overman v. Overman* (1986), Ind.App., 497 N.E.2d 618, where both parents were Catholic and the trial court ordered father to take his son to Saturday catechism classes despite father's claim that such action interfered with his week-end visitation

rights. This court upheld the trial court's decision by pointing out that the trial judge was attempting to balance the visitation rights of the noncustodial parent with the right of the custodial parent to determine the child's religious training, and that the class attendance was a slight or insignificant interference with the father's visitation rights—and therefore justified. *See also In re Marriage of Davidson* (1989), Ind.App., 540 N.E.2d 641. The issue here is whether the judge expressed a religious bias and used it to deny Middy custody. In the opinion of this writer, the judge went farther than an inquiry into whether taking the child to church was an interference with Middy's visitations rights. Unlike *Overman,* this judge's continued questioning of Vance and Middy on this issue humiliated and intimidated them into making promises that they would alter their behavior if granted custody. See e.g. Note, *Religion and Child Custody Disputes,* 82 Mich.L.Rev. 1702 (1984), n. 61 at 1720–1721:

"Other courts and commentators have also recognized that people will alter their religious behavior or at least lie about it in response to coercive pressure by the court awarding custody. For example, in *People ex rel. McGrath v. Gimler,* 60 N.Y.S.2d 622, 627 (N.Y.Sup.Ct.1946), aff'd mem., 270 A.D. 949, 62 N.Y.S.2d 846 (1946), the custody battle involved parents who had baptized their child as a Catholic. When the parents separated, the mother, a Lutheran, began to bring the child up in her own religion. The father claimed he would raise the child a Catholic. In the midst of the custody hearing 'the child was, more or less hurriedly, introduced [by her mother] to the Catholic pastor in the neighborhood, entered in the parochial school there, and began to receive religious instruction.' 60 N.Y.S.2d at 627. The judge expressed his belief that the mother's knowledge that the court would want the child raised in the religion into which she had been baptized had played a part in the mother's decision to change the child's religious focus to Catholicism."

clearly against the logic and the facts and circumstances before the court. *Williams v. Trowbridge* (1981), Ind.App., 422 N.E.2d 331. We note that the judge made it clear the *primary* and, in effect, only reason for his decision was that there was no change in the custodial home or care of the child which warranted a modification.

In summary, Middy has not shown the necessity for a reversal or a new trial because she did not meet her burden of proving that a change of custody was necessary for Jason's welfare. Nevertheless, the judge had no authority or right to advise these parents on how to practice their religious beliefs. First, his personal standards are not relevant and, second, the religious training of children is for the custodial parent to determine and not the state. *See* IC 31–1–11.5–21(b); *Dunlap, supra.*

*III. Support*

■ Middy next claims the court abused its discretion in modifying support payments by ordering her to pay twenty-five dollars per week when there was no showing of changed circumstances so substantial and continuing to warrant a change in the support order. The dissolution decree of July 28, 1980, (when Jason was one year old) provided that Middy would have no responsibility for the payment of child support.[6] She claims that she is not working and has no income, and that the record reveals that Stephen has been able to increase his income substantially since the divorce.

■ The amount of a child support order is, like the custody determination, left to the sound discretion of the trial court and, absent an abuse of discretion, the trial court's decision will be not be reversed. *In re Marriage of Saunders* (1986), Ind.App., 496 N.E.2d 419. We may reverse such an order only if it is clearly against the facts and circumstances before the trial court. *Id.*

Middy cites *Saunders, supra,* as being similar to her circumstances. In that case, this court found the trial court abused its discretion in ordering the mother to pay support of $60 per week when her income was only $60 to $90 per week. However, the situation in *Saunders* is clearly distinguishable from the present case. Here, Middy came to court requesting custody because she was in a better financial position to provide for Jason. Although there was no testimony as to the amount of income of her new husband, she claimed as a basis for a change in custody that 1) she had a new home; 2) Jason would have a room of his own; 3) she provided name-brand clothing for him; and 4) she would not request support from Stephen if she were granted custody of Jason. In other words, she claimed that she was financially better off than Stephen.

■ A modification of support requires a showing of changed circumstances, but the court is required to consider the *totality* of the circumstances involved in order to ascertain whether modification of child support obligation is warranted. *Billings v. Billings* (1990), Ind. App., 560 N.E.2d 553. We first observe that every parent has a duty to support his/her child. *Wagner v. Wagner* (1986), Ind.App., 491 N.E.2d 549. Many factors determine a parent's ability to pay support besides, and in addition to, income. *Wilson v. Pittman* (1990), Ind.App., 555 N.E.2d 499 (*reh'g granted* on other grounds, Ind. App., 559 N.E.2d 618), citing *McCallister v. McCallister* (1986), Ind.App., 488 N.E.2d 1147. The trial court must consider the children's needs and the parent's general economic condition as it affects the parent's ability to financially provide for the children. *Id.* Even when a parent is unemployed or underemployed, income will be imputed to that parent for purposes of a support order. *Billings, supra;* Indiana Child Support Guidelines.[7]

---

**6.** This provision was based on an agreement between the parties, which is not binding. A custodial parent has no right to enter into an agreement or to contract away the right of a child to support from a parent. *Pickett v. Pickett* (1984), Ind.App., 470 N.E.2d 751.

**7.** At the time of the hearing in this matter, the trial court was not obligated to determine the amount of child support based on the Indiana Child Support Guidelines. After October 1, 1989, the Guidelines must be used in all Indiana courts to establish or modify support. How-

We also observe that Stephen had the burden of supporting Jason for the first eight years of his life without any contribution from Middy and the court ordered her to pay a minimal amount for support. Changed circumstances can be found from the number of years which have passed since the original order was entered and the fact that it costs more to support a maturing child of eight years than it does to support an infant. *Crowe v. Crowe* (1965), 247 Ind. 51, 211 N.E.2d 164; *Vore v. Vore* (1991), Ind., 573 N.E.2d 397, *affirming Vore v. Vore* (1990), Ind.App., 563 N.E.2d 154. An additional change in circumstance is that Middy now claims that she is financially able to provide Jason with the better things in life.

We cannot find the court's order for Middy to pay support against the logic and effect of the circumstances. It is clearly otherwise. While the court did not hear specific evidence of Middy's or Stephen's economic situation or the child's needs which, of course, is the best and required practice in most instances, the court fixed a minimal payment of twenty-five dollars per week. See footnote 7. In the interests of judicial economy, we affirm the court's support order.

### IV. Transportation arrangements

Middy had moved to Danville, Kentucky from Corydon, Indiana, where Stephen lives. She contends the trial court abused its discretion in refusing to modify the transportation arrangements which required her to bear the costs and responsibility for transportation of Jason for visitations. The order also included a contingency provision in case she were to become pregnant, relieving her of the responsibility for transportation. At trial, she claimed it was a hardship for her to be responsible for all the transportation because it is a 110 mile, two hour drive over twisting roads.

On appeal, she claims the arrangements are oppressive and cause her undue hardship and expense. She also claims, in allocating all the costs of transportation to her, the court treated her with bias and prejudice because she chose to move out-of-state. She cites *Mikels v. Mikels* (1967), 248 Ind. 585, 228 N.E.2d 20 and *Pea v. Pea* (1986), Ind.App., 498 N.E.2d 110, which held that a *custodial* parent's move out-of-state is not *per se* a basis for a change of custody. She argues that these same protections should be extended to a noncustodial parent in regards to visitation; however, she does not cite any cases which hold that a court abuses its discretion when it assigns all the responsibility for transportation to the noncustodial parent.

The court indicated that he was not inclined to change the transportation arrangement because Stephen had two other children and had a job; whereas, Middy was not employed and, at the time, had no other children. Middy also has relatives in Corydon that she could visit when she makes the trip; whereas, Stephen has no relatives in Danville. We cannot find that the trial court's decision is unreasonable or an abuse of discretion based on the circumstances.

### V. Ex-parte order

Stephen contends that Middy improperly obtained an *ex-parte* order [8] from the trial

---

ever, the Guidelines are useful in this case in determining whether the child support established by the court was illogical or unreasonable. For example, a specific amount of child support should always be ordered. Child Supp. G. 2. Potential income must be determined if a parent has no income. Child Supp. G. 3. One purpose of potential income is to fairly allocate the support obligation when one parent remarries and, because of the income of the new spouse, chooses not to be employed. Child Supp. G. 3, Commentary. The guidelines do not set a minimum support obligation, but for couples with combined weekly income of $100 or less, the suggested amount for child support is $25–50. Child Supp. G. 2.

8. The Record of Proceedings was filed by Middy on December 20, 1989. The appellant's brief was filed on March 13, 1990. Stephen filed an affidavit with his Appellee's Brief in which he represents that on April 10, 1990, Middy filed an Ex-parte Application to Amend Order Modifying Decree with the trial court. He further alleges that 1) in her petition for *ex-parte* order, she did not disclose that the case was on appeal and 2) the Order to Amend the Decree was executed by Special Judge, Henry Leist on April 10, 1990. He claims he was forced to file a motion to vacate in the trial court and a hearing was to be held on June 12, 1990 and, thus, he was forced to simultaneously defend this appeal in both the appellate court and the trial court.

court changing the transportation arrangements after the appeal was perfected. He requests attorney's fees for the resulting necessity to defend this appeal and prosecute an action to set aside the *ex-parte* order in the trial court. Stephen argues that Middy's actions were inappropriate in that once an appeal has been filed, the entire cause is removed from the trial court. *Logal v. Cruse* (1977), 267 Ind. 83, 368 N.E.2d 235, *cert. denied* 435 U.S. 943, 98 S.Ct. 1523, 55 L.Ed.2d 539 (1978); *Bright v. State* (1972), 259 Ind. 495, 289 N.E.2d 128; *Chapman v. Chapman* (1987), Ind.App., 512 N.E.2d 414. *But see, Wagner, supra,* (issue separate and distinct from issue on appeal—in this case, attorney's fees—does not deprive trial court of jurisdiction); *accord Scheetz v. Scheetz* (1987), Ind.App., 509 N.E.2d 840, *reh'g denied* Ind.App., 522 N.E.2d 919 (1988).

■ Stephen has waived the error, if any, by failure to properly preserve the error for appeal because: 1) he did not object at trial when the court stated that if Middy became pregnant she could obtain an *ex-parte* order if she provided the court with a doctor's statement, *Jones v. Marengo State Bank* (1988), Ind.App., 526 N.E.2d 709; 2) he did not raise any cross-error on this appeal with regard to the contingency provision included in the court's transportation order, Ind. Trial Rule 59(G); *Haycraft v. Haycraft* (1978), 176 Ind.App. 211, 375 N.E.2d 252; and 3) he did not follow the proper procedure for supplementing the record as required by Ind. Appellate Rule 7.2 and, thus, whether Middy actually obtained such an order is not properly before this court. *Dean v. Insurance Co. of North America* (1983), Ind.App., 453 N.E.2d 1187.

### VI. Appellate attorney's fees

Stephen asserts that Middy brought this appeal only for purposes of harassment and he requests attorney's fees for this appeal on the basis that the custodial proceedings themselves were so frivolous as to amount to harassment.

■ A claim or defense is "frivolous" if it is taken primarily for the purpose of harassment, if the attorney is unable to make a good faith and rational argument on the merits of the action, or if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. *Brant v. Hester* (1991), Ind. App., 569 N.E.2d 748, citing *Kahn v. Cundiff* (1989), Ind., 543 N.E.2d 627, *adopting* (1989), Ind.App., 533 N.E.2d 164; IC 34–1–32–1.

■ While we affirm the trial court, Middy's appeal asserted rational and good faith arguments. The only indication of harassment is found in Stephen's affidavit submitted to this court with his Appellee's Brief in which he claimed that Middy told him she had the money to keep going back to court until he was broke and then he would have to relinquish custody. This was not an issue at trial and no evidence was presented to the trial court on this matter. As a reviewing court, we do not weigh evidence or judge credibility. *Watson v. Thibodeau* (1990), Ind.App., 559 N.E.2d 1205. Therefore, we cannot determine whether there is any truth to his allegations that this appeal was brought *only* for purposes of harassment.

We deny Stephen's request for appellate attorney's fees on the basis of a frivolous appeal. However, when this is returned to the continuing jurisdiction of the trial court, Stephen is free to petition the trial court to exercise its discretion to award attorney's fees in defense of the appeal. IC 31–1–11.5–16(a); *Sovern v. Sovern* (1989), Ind.App., 535 N.E.2d 563.

The judgment of the trial court is affirmed.

CHEZEM, J. concurs in result.

BAKER, J. concurs in result and files separate opinion in which CHEZEM, J., joins.

BAKER, Justice, concurring in result.

While I concur with Judge Miller's disposition of this appeal, I believe he may have gone too far in his criticism of the trial judge.

As recognized by Judge Miller, Middy failed to meet her burden of showing prima facie evidence that a substantial and continuing change necessitated a change of custody, and thus she is not entitled to reversal or a new trial. Additionally, she did not object to the trial court's questioning of her and her husband, and improperly raises the issue for the first time on appeal. As Judge Miller further notes, Middy waived any error concerning the consideration of the religious training of the child by inviting the error.

Turning to the matter at hand, Judge Miller, Judge Chezem, and I all agree that there are no state guidelines for religious upbringing, and that such guidelines would be inappropriate and unconstitutional. My disagreement with Judge Miller lies in his assertion the trial judge was, in essence, laying out such guidelines in his inquiries into Jason's religious upbringing.

In addition to a change of custody, Middy alternatively sought an expansion of visitation rights. She was aware of, and assented to, Stephen's earlier request that Jason attend church on the week-ends he was with her, and this was not an improper request on the part of the custodial parent. *See Overman v. Overman* (1986), Ind.App., 497 N.E.2d 618, *trans. denied.* The trial judge was simply questioning Middy about her past compliance with this request, and attempting to gauge the likelihood of future compliance in light of her desire to have increased visitation with Jason. Under *Overman* and its interpretation of IND.CODE 31–1–11.5–21(b), this line of questioning was proper in the context of a request for expanded visitation.

The trial judge's comments in this case were not expressions of displeasure over Middy's religious upbringing of the child, and were not suggestions that Middy and her husband were not good Catholics or did not have sincere religious beliefs. The trial judge stated Jason should be raised in his religion if he was used to being raised in his religion. The judge responded to an attorney's comment that the judge found church attendance important by stating he did not want to give the impression that he thought it was important, but rather, that it appeared to be important to Stephen, the custodial parent. The trial judge simply was inquiring as to whether Middy and her husband would really take Jason to church, as the custodial parent wanted and as they said they would do, when in the past they had not done so. This was in the context of Middy's request for increased visitation, not a discussion on the appropriateness of her religious beliefs.

Judge Miller recognizes trial judges have a most difficult task in these cases, and I hesitate to criticize the comments made by the trial judge here when the comments are viewed in their totality.

I concur in the result.

### APPENDIX

Middy acknowledged that, in a modification hearing in 1984, Stephen had requested that she take Jason to church when she had visitations. She admitted that she had not done so. Then the following exchange took place between Middy and the judge:

THE COURT: Have you ever taken him to church?

A. Yes, I have.

THE COURT: How many Sundays?

A. I don't know.

THE COURT: Why would you think then that I would—if you haven't taken him to church and I requested that you continue with this religious education when he was with you by taking him to church and you haven't—what makes you—you've only maybe done it once or twice—what makes you believe that I could believe that you would take him to church when you're not going now and you never have been going? Why, why do you think that I would believe that you would take him to church? Why haven't you been doing that? And what assurance can you give me that you are going to change like Saul did to Paul overnight from a bolt of lightning? All at once you're going to be a churchgoer when you haven't been a church goer before?

A. Yes, I have been a churchgoer but . . .

THE COURT: When was the last—what religion do you belong to now?

A. When I go to church I go to a Catholic church.

THE COURT: When did you last go to a Catholic church?

A. I don't know.

THE COURT: Okay. Go ahead.

(R. 78–80).

Later during the re-direct examination of Middy, the court again became involved in questioning Middy:

THE COURT: Let me ask you this question. I get the general impression from the questions asked that at least to the father in the father's estimation the raising of the boy in whatever religion that he was being raised in—and in this particular instance it appears to be the Catholic religion—is important. You've had the child for three weeks this summer, is that correct? Three weeks or four weeks this summer?

A. Four weeks this summer.

THE COURT: Four weeks this summer. And what, during what months did you have him?

A. It was in the month of June.

THE COURT: All the month of June. How many times did you take him to Catholic church?

A. During this three weeks?

THE COURT: Uh huh.

A. None

THE COURT: You didn't, did you. Now, you gave the impression today in the questioning when your attorney asked the questions, the reason you didn't take him to church was because you were pressed for time when you came up here, but the fact is you don't take him to church when he's down there with you, do you?

A. No, not very often.

THE COURT: Is your husband a practicing Catholic? A practicing Catholic. Not just a Catholic by birth—a practicing Catholic?

A. By the definition of a practicing Catholic—

THE COURT: Does he go to church on Sunday?

A. Every Sunday, no.

THE COURT: How often does he go to church?

A. No more regularly than I do.

THE COURT: Like Christmas and Easter?

A. Christmas, Easter, the holidays of course. I mean there's other times in between but ..

THE COURT: No further questions.

(R. 102–104).

During the direct examination of Middy's husband, Vance, Middy's counsel asked him:

Q. Now in regard to—there's some question about you being Catholic? Are you Catholic?

A. Yes, I am Catholic. I am not perfect. I've got a lot of flaws and I wish I could backtrack and change a few of them, but I can say this without a doubt that if [the Court] blesses us with Jason back, that, yes, we will go to church and every, we'll make every effort possible to get to church and to do anything possible to see that Jason not only ..

THE COURT: I'll ask you the same question I asked her: You know how important this is undoubtedly to the father of the child. You've had the child three, four weeks this summer, six weeks last summer, your wife can't remember when she was in a Catholic church. She says you and she don't go only maybe on Easter and Christmas. If you felt this strongly about this boy, why didn't you help him along even though his custody was with the father in his religious training? Why didn't you do it?

A. As I said, sir, I owe not only my wife an apology for this, or not only you or Steve or Jason, but I do owe apology for not doing it in the past. Why I didn't—there's a lot of things that go into a person's life and the religious background. I was born, raised a Catholic. I went to Catholic church when I was in college. I continued to go to church when I was in college. I came home. I

went for a while when I came home from college. Why I discontinued, there are things that, and I don't know.

THE COURT: Well, it doesn't make any difference to me if this boy was a Methodist or a Presbyterian or a Jewish boy. He should be raised in his religion, if he is used to being raised in his religion, and you're telling me that all of a sudden you're going to change all of this, but you haven't done it in the past. What makes you believe that I believe you? That's what I'm trying to ask you. What makes you think I believe you?

A. Well, sir, I believe in certain things. I believe that not only, and I'm sure you believe the same way, that not only is religion gotten from going to church, but you also have to practice what you learn at church.

THE COURT: Well, I get the impression that you don't think it's necessary that you formalize your religion, is that correct?

A. No, I think it is important. Why haven't I done it? There's no excuse for it. There's no excuse—I can't go back and I can't change the past now. But I, I can sure change the future.

THE COURT: When did you file, this Petition to Modify was filed when?

A. I don't know what the date is.

THE COURT: Was sometime in June. Yes, sometime in June. And you've known since June that we were going to have this hearing. Why didn't you—

A. I, may I speak?

THE COURT: Yes.

A. I want to say this. Jason's morals, Jason's standards, the qualities, the important things in life are not only taught in the church on Sundays. I firmly believe that. I know without a doubt being in the type work that I'm in, I know and believe without a doubt that there is a superior being, a God that has, has to coordinate all of these things. Because I haven't gone to church in the past doesn't mean I'm not going to go to church in the future.

THE COURT: It gives a good indication though doesn't it?

A. Well, sir, it indicates that I haven't in the past. Does it indicate that I won't in the future, no sir, I have to disagree there.

Mr. Garry (the Trues' attorney) Let me ask you a question.

THE COURT: Go ahead.

Garry: Quite frankly, we didn't talk much about the religious aspect of it, but if I, if you had known that the Judge was going to take an interest in this, and rightfully so, and that this case may turn on whether or not you took Jason to church on Sunday, would you have taken him to church on Sunday all of the times that you were with him?

A. Yes.

Garry: And now that you know this Judge is interested in that, and he thinks that's important, does that add to your determination to abide by this Judge's wishes because he thinks it's important?

A. Yes sir, I have already said and I'll say again: Jason will be in church.

Garry: We may have perhaps, as your attorney, and I, we may have perhaps underestimated the importance of this, but now that we know how important it is and the desire that you and Middy have for having Jason live with you, there is no chance is there that you will not see that this young man gets to church every Sunday and gets to religious schooling?

THE COURT: Let me say this. I don't think it is that important. I don't want to give you the impression I think it's that important. But I do think it's important with this father. I got the general impression with him that he wishes the religious education of the child to continue and it is an element to consider. I don't think that the child has any, there's any duty to raising him Catholic or Protestant or Jewish or Moslem or whatever they wish to raise him, and I think they have an equal right to raise him if they have the custody however they want to, but I do think it's a consideration on a continuity basis as to wheth-

er he shall, it's an element to be considered, and I think that they knew this and I in questioning them, I think they should have known it because his father is at least through the questioning has indicated to her that he wants him to go to church, but she has not and neither has this gentleman seen that he went to church.

Garry: I guess, Judge, I've been a little remiss in that from the initial interview on I've mentioned this but I didn't give it maybe the proper, in my discussions with them maybe I didn't give it the proper emphasis that I should have given.

THE COURT: Well, I don't think it's a determining factor by any means, but I do think it's an element to consider.

(R. 108–115).