**FOR PUBLICATION**



APPELLANT PRO SE:

**J.W.J.**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
STATE OF INDIANA:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KYLE HUNTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE: THE PATERNITY OF Jo.J., | ) | |
| | ) | |
| J.W.J., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 29A05-1209-JP-447 |
| | ) | |
| D.C., | ) | |
| | ) | |
| Appellee-Petitioner.[1] | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT #2
The Honorable Daniel J. Pfleging, Judge
Cause No. 29D02-0708-JP-949

---

[1] The Attorney General participates in this appeal because in the trial proceedings, the State actively participated in this cause pursuant to Indiana Code section 31-14-4-2. Although the State's role pursuant to this statute is to represent the child in paternity proceedings, we also attribute the State's arguments to D.C. to the extent that their interests are aligned.

OPINION–FOR PUBLICATION

**BAKER, Judge**

J.W.J. (Father), who works as a commissioned salesman, has continuously used "creative accounting procedures" for several years to minimize his gross income and reduce his child support obligation. Appellant's App. p. 32. Father also has a pattern of accumulating large arrearages and then paying them when a petition for contempt is filed.

A few years ago, D.C. (Mother) appealed an order reducing Father's support obligation based on Father's alleged decrease in earnings, and this Court reversed the trial court's determination of Father's income. Before that appeal was recertified to the trial court, however, Mother requested a temporary modification of support based on our guidance. After a combined hearing on this petition and on yet another contempt petition filed regarding yet another large arrearage, the trial court granted Mother's request for temporary modification, changing Father's child support obligation to $252.52 per week. The final order modifying Father's support was not issued until the day after our Supreme Court denied transfer of Mother's appeal. The trial court also ordered Father jailed for contempt but agreed to release Father upon his payment of a bond equal to six months of future support.

Father challenges numerous aspects of the trial court's order, including: (1) whether the trial court could hold a hearing or issue an order on Mother's request for a temporary support modification while her appeal was still pending; (2) whether the trial

court accurately calculated his gross income, Mother's gross income, and the final child support obligation; and (3) whether the trial court could order him incarcerated for contempt when he was current on his child support obligation at the time the order was made or issue a bond for future support. Father also requests appellate attorney fees.

We conclude that although the trial court may have erred in considering Mother's request for "temporary support" prematurely, it did not err in modifying Father's child support obligation because the matter had been recertified to the trial court by the time the final order was made. Likewise, the figures that the trial court used in arriving at the amount of Father's new child support obligation were within its discretion based on the evidence presented. We also conclude that the trial court did not err in jailing Father for contempt when Father had been warned multiple times at various hearings that this could occur if Father failed to strictly comply with his child support obligation and that trial courts are statutorily authorized to require a child support obligor to post a bond guaranteeing future payments of support. Finally, we decline Father's request for appellate attorney fees. Accordingly, we affirm the judgment of the trial court.

## FACTS[2]

---

[2] We note that Father's "statement of case" and "statement of facts" sections in his brief are replete with self-serving facts and argument and thus do not abide by the requirement of our appellate rules to present the facts according to the standard of review appropriate for the judgment being appealed. See Ind. Appellate Rule 46(A)(5)-(6); Burrell v. Lewis, 743 N.E.2d 1207, 1209 (noting that a statement of facts that is "rife with argument" is "inappropriate" and a violation of our appellate rules).

Also, during the pendency of this appeal, Father filed two motions asking this Court to consider further evidence. The first motion asks us to consider two motions to correct errors that Father filed in July 2012—one titled Respondent's Motion to Correct Errors re: Final Order of June 14, 2012, and the other

3

Mother and Father have been litigating child support issues concerning their minor child, J.B.J., for several years. In July 2010, Father's weekly child support obligation was reduced to $149.54 plus $100 on his $6,970.81 arrearage based on Father's alleged decrease in earnings, and Mother appealed, raising a number of issues. On October 25, 2011, this Court affirmed in part and reversed in part in a memorandum decision. D.C. v. J.J., No. 29A02-0708-JP-1111, 957 N.E.2d 213, at *1 (Ind. Ct. App. Oct. 25, 2011). Concluding that the trial court erred in determining Father's income for 2010 and by granting Father a credit for health insurance premiums for a time period when no coverage was being provided to J.B.J., this Court remanded the case for a redetermination of Father's income and a recalculation of Father's support obligation and arrearage. Id. at *10-12. Our Supreme Court denied transfer on June 20, 2012. D.C. v. J.J., 969 N.E.2d 605 (Ind. 2012).

While Mother's appeal was pending, Mother requested and received a change of judge, and the Honorable Daniel Pfleging was appointed as special judge on June 21, 2011. After a hearing in August 2011, Judge Pfleging issued an order that stated in part, "the true certainty of the entire days' [sic] worth of testimony is that [Father] is not paying support as ordered." Appellant's Br. p. 43. Judge Pfleging further admonished the parties to obey the court's orders and advised them that "contempt is serious and often results in sanctions which can mean incarceration." Id. Finally, Judge Pfleging

titled Respondent's Motion to Correct Errors re: Order to Pay Support. As both of these documents were already included in Father's appendix, we deny Father's motion to consider filed October 9, 2012.

changed the location where the parties were to exchange J.B.J. for parenting time from a fire station to a nearby gas station.[3]

On May 25, 2012, the trial court held a consolidated compliance hearing on one of Mother's prior contempt petitions and on Mother's request for a "temporary" child support order to be issued pending a final decision on her appeal. Appellant's App. p. 21. At the hearing, Father admitted that he had only been making support payments of $50 per week since March 15, 2012, and that he had not been paying anything toward his arrearage.

Father, who is a commissioned sales professional, claimed that he had no income because he was negotiating a new contract with Level Solutions and because he had been injured in his part-time job at FedEx, which he had started in March 2012. However, in the prior two months, Level Solutions had advanced Father a total of $8000, from which Father's future commissions were to be reduced as he began making sales for the company. In addition, Father's earnings while at FedEx were approximately $800.

In 2011, Father did business with Barth Electric and received approximately $14,000 in personal commissions. Then, beginning in May or June 2011, Father's wife became the sole owner of Johnston Technology Group, LLC (JTG), and JTG and Level

---

[3] In Father's second motion to consider, Father asks us to consider the change in the parenting time exchange location in his appeal. Father contends that this issue was included as part of the trial court's denial of his motion to correct errors on August 8, 2012. However, neither of Father's motions to correct errors denied on that date included the exchange location as an issue. Moreover, as the trial court's original order changing the exchange location was issued on August 26, 2011, and Father did not appeal that order, Father's request to include this issue in his present appeal is not timely. Ind. Appellate Rule 9(A)(1). Accordingly, Father's second motion to consider is also denied.

Solutions entered into "a contract where [Father] was going out and making [sales] calls and [Father's wife] was basically running the company." Tr. p. 98. Father testified that because he was not an owner of JTG, he did not know the value of the Level Solutions contract to JTG, and his wife received all of the commissions from that contract and used those monies to pay their joint bills so that Father could concentrate on making sales rather than running a business. An exhibit submitted at the hearing showed that, similar to Father's arrangements with Level Solutions at the time of the hearing, JTG had received monthly commission advancements of $4000 each for the months of October 2011, November 2011, and January 2012. However, Father submitted a letter from Level Solutions indicating that from May 2011 to December 2011, JTG earned only $1,968.72 in actual commissions. Respondent's Ex. F.

Also in 2011, Father cashed in his IRA, receiving in excess of $58,000 that he claimed to have used for living expenses. Father also received $63,000 from the sale of his home, but Father reportedly gave all of this money to his ex-wife, from whom he had separated in February 2012. Father allegedly obtained additional spending money by selling off assets, including furniture and small recreational vehicles.

Regarding Father's expenses, Father testified that he spent $800 monthly on transportation costs because he was making cold sales calls all over the state trying to "ramp up a territory." Tr. p. 101. According to Father's financial declaration, his other monthly expenses totaled $2,411.19. Father also testified that his food costs "range[] from $700.00 to $900.00 bucks a month." Id. at 51. Father admitted to taking a $5000

6

vacation in December 2011, but he characterized his expenses as "bare bones living." Id. at 110. When asked how he could support these expenses with no income, Father told the trial court that he was not behind in his rent but stated that he was considering filing bankruptcy.

Father also claimed that he was "up to speed" on his child support obligation and arrearage as of February 2012. Tr. p. 109. However, the State presented evidence that since January 2012, $2,990.80 in child support had become due, Father had received $8000 in commission advancements and $800 in other wages, but Father had fallen further behind on his arrearage. More particularly, in the eleven weeks before the hearing, $1,645.49 became due, but Father paid only $500 of that amount in weekly installments of $50 and had contributed nothing to his growing arrearage, which was $1,192.64 at the time of the hearing.

Mother testified that she earned approximately $22,000 in 2011 and that she had $1989 in monthly expenses without accounting for childcare or food. However, Mother failed to provide the trial court with a financial declaration.

At the conclusion of the hearing, the trial court asked Mother to submit her financial declaration and Father to submit a child support worksheet before taking the matter under advisement. And in the two weeks following the hearing, Father made payments totaling $1,622.64 to become current on both his weekly support obligation and the arrearage.

7

The parties reconvened on June 14, 2012, for the pronouncement of the trial court's decision. The trial court briefly recited the case's history, including that Father had been found in contempt of court three separate times since 2009 for his failure to pay support in a timely and consistent manner, but that other than the contempt findings and admonishments to pay support as ordered, no further sanctions had ever been imposed.

In relaying its findings of fact, the trial court noted that "[u]ntil 2012 [Father] had reduced his arrearage but in 2012 the arrearage had grown by $798.27." Appellant's App. p. 42. The trial court also expressed concern regarding Father's accounting practices, noting that Father "claims to be unemployed and/or having no income but spends $800.00 per month in transportation to make cold calls all over the state" and that "in late 2011 or early 2012 [Father] took a vacation and expended over $5,000 for said vacation." Id. at 43.

The trial court determined that Father's failure to pay his child support obligation timely and consistently was "willful and wanton" because during the time period since the last contempt hearing, Father "had resources in which he was able to pay for a vacation and pay other expenses rather than support." Id. at 44. And although Father was current in his support as of June 14th, the trial court determined that coercive measures were still needed to ensure consistent payment of "future support." Id. Accordingly, the trial court ordered Father to serve thirty days of incarceration in the local county jail. The trial court also ordered Father to post a $6070 cash bond to be applied to Father's support payments and arrearage over the next six months "to take care

8

of [Father's] support obligations while he is ramping up his new business." Tr. p. 172-73. Father was released when he posted the full bond amount on June 15, 2012.

The trial court issued a formal written order regarding its June 14, 2012 orders on June 21, 2012. And in a separate order filed the same day, the trial court further explained that it had changed Father's weekly support obligation to $252.52 per week based on its determination that Father's weekly gross income was $1847. In arriving at this income amount, the trial court reiterated its concern that Father "uses creative accounting procedures and/or numerous corporations to confuse and on some occasions to actually misstate his income position." Appellant's App. p. 32. In particular, the trial court noted that Father has $3270 in monthly expenses but that "[s]omehow, [Father] makes his expenses with no income." Id. at 31. The trial court further stated that it was attributing a weekly income of $1847 to Father because that amount, though "substantially lower than the State's [worksheet provides] . . . will reflect what he would have to earn to meet the expenses that he indicates he has." Id. at 33.

The trial court attached four child support worksheets to its order—one submitted by Father, one submitted by the State on behalf of Mother but not signed by her,[4] and two created sua sponte by the trial court. Each worksheet provided for a different child support amount, with those amounts ranging from $95 to $278.77 per week, but the trial

---

[4] Although the child support worksheet was not signed by Mother, the State based Mother's income and liabilities off Mother's financial declaration, which Mother had signed under penalty of perjury and submitted after the conclusion of the May 25, 2012 hearing.

court did not adopt any one worksheet in particular in temporarily modifying Father's support obligation to $252.52 per week.

Father filed two motions to correct errors, one for each of the court's final orders, on July 16 and 20, 2012. The trial court denied both motions, and Father now appeals.

### DISCUSSION AND DECISION

Father raises numerous issues for our consideration. More particularly, Father asserts that the trial court lacked jurisdiction to issue a temporary support order while Mother's appeal was still pending, and that even if the trial court could temporarily modify child support during Mother's appeal, the specific support amount ordered was not supported by the evidence. Next, Father claims that the trial court erred when it held Father in contempt and ordered his incarceration without due process of law. Finally, Father contends that he is entitled to attorney fees.

We will affirm the trial court's judgment on an issue of child support unless it is clearly erroneous, meaning that it is clearly against the logic and effect of the facts and circumstances before the court. McGinley-Ellis v. Ellis, 638 N.E.2d 1249, 1252 (Ind. 1994). We consider only the evidence and reasonable inferences supporting the trial court's judgment and refrain from reweighing the evidence or assessing the credibility of witnesses. Hamiter v. Torrence, 717 N.E.2d 1249, 1252 (Ind. Ct. App. 1999). Moreover, because Father is appealing from the denial of two motions to correct error, we note that a trial court's decision on a motion to correct error "comes to an appellate court cloaked

10

in a presumption of correctness." Petersen v. Burton, 871 N.E.2d 1025, 1028 (Ind. Ct. App. 2007).

I. Jurisdiction to Issue Temporary Support Order

As mentioned above, Father's first contention is that the trial court lacked the authority to modify the existing child support order while Mother's appeal was pending. And because our Supreme Court did not deny transfer on Mother's appeal until June 20, 2012, Father asserts that the trial court should never have granted Mother a hearing on May 25, 2012, and that all of the orders stemming from evidence presented at that hearing should be vacated as being issued without subject-matter jurisdiction.

When the trial court was discussing with the parties what was to be addressed at the May 25, 2012 hearing, the following colloquy took place:

> [Father's attorney:] We are here on modification?
>
> THE COURT: No, a temporary order, not modification.
>
> [Father's attorney:] What's the difference?
>
> THE COURT: I'm not really sure.

Tr. p. 148.

Mother offered the following explanation regarding why she had requested a temporary support order:

> I am largely dependent on $250.00 a week to sustain the bills that this family has, and I requested . . . temporary child support to be put in place, so that there would not be a lag time between now and the decision that will be handed down from the higher courts, and I absolutely need $250.00 a week to pay my bills.

11

Id. at 149-50.

As Father suggests, the appeal of a particular issue—here, the amount of Father's weekly child support obligation—generally divests the trial court of further jurisdiction over the issue until the appeal is finalized. Elbert v. Elbert, 579 N.E.2d 102, 114 (Ind. Ct. App. 1991). In Harris v. Harris, this Court considered whether the premature filing of a petition to modify child support made the subsequent modification void. 800 N.E.2d 930 (Ind. Ct. App. 2003). In concluding that it did not, we reasoned that "the filing of any such premature pleading may subsequently be cured so long as the trial court does not invoke jurisdiction of the matter." Id. at 937. Thus, because the trial court had not actually modified child support until after the trial court's judgment was affirmed on appeal and the matter was recertified to the trial court, at which point the trial court was once again vested with jurisdiction over the support issue, there was no error in ordering a prospective modification of support. Id. However, the Harris Court also concluded that it was error for the trial court to order the modification retroactive to the date of the premature filing because "[t]o so hold would be to validate without qualification the filing of the Petition to Modify as of that date." Id.

In this case, by requesting "temporary support," it is apparent that Mother was hoping to take premature advantage of certain favorable aspects of our memorandum decision in D.C. v. J.J., No. 29A02-0708-JP-1111, 957 N.E.2d 213, at *1 (Ind. Ct. App. Oct. 25, 2011). Specifically, although Mother had petitioned for transfer to our Supreme

12

Court on other issues that were decided less favorably to her, she wanted the trial court to proceed to recalculate Father's income and child support obligation based on the memorandum decision's guidance, even though the matter had not yet been recertified back to the trial court.

Although, based on Harris, Mother's request was premature, the trial court's final, written orders temporarily modifying child support were not issued until June 21, 2012— one day after our Supreme Court denied transfer. These are the orders from which Father filed his motions to correct error. Thus, as these orders recalculating Father's income and support obligation were not issued until after the denial of transfer, the trial court did not err in modifying Father's support obligation prospectively. See Harris, 800 N.E.2d at 937. Moreover, unlike Harris where this Court had affirmed the trial court's judgment on appeal, here the trial court was ordered on remand to recalculate Father's income and child support obligation back to 2010. D.C. v. J.J., 957 N.E.2d at *11. Thus, the trial court acted within its discretion to modify Father's child support obligation effective June 14, 2012.[5]

---

[5] During the pendency of this appeal, the trial court also recalculated Father's income and child support obligations for 2010, 2011, and 2012. After an order was issued on March 18, 2013, Father filed a "Motion to Vacate Order of Lower Court and to Set Emergency Hearing for Child Support" on May 9, 2013, asking us to conclude that the trial court was once again divested of jurisdiction to consider these issues as a result of the present appeal. However, because the orders currently being appealed did not recalculate Father's 2010, 2011, or 2012 child support obligations prior to June 14, 2012, as the trial court had been ordered to do on remand, Father's income and child support obligations for those periods remained within the jurisdiction of the trial court during the pendency of this appeal. If Father wished to appeal the trial court's order issued March 18, 2013, he should have filed a separate notice of appeal. Father cannot include his challenges to that order in the present appeal. Father's motion is hereby denied.

13

We note for the purpose of clarification that a trial court is not precluded from entertaining a separate and distinct petition to modify child support even if a previous support order is still being appealed. See Clark v. State, 727 N.E.2d 18, 21 (Ind. Ct. App. 2000) (explaining that a trial court retains jurisdiction notwithstanding an appeal to "preside over matters which are independent of and do not interfere with the subject matter of the appeal"). Indiana Code section 31-16-18-1(b) provides that, subject to certain exceptions not relevant here, child support orders may be modified either:

> (1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or
>
> (2) upon a showing that:
>
> > (A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and
> >
> > (B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

Because a statutory right to modify support exists any time the elements of either subsection are met, the trial court retains continuing jurisdiction to consider separate and distinct petitions to modify child support regardless of whether a prior order is still on appeal. See Clark, 727 N.E.2d at 21 (holding that a trial court retained jurisdiction to consider whether to revoke a defendant's probation during his direct criminal appeal because the revocation issue was sufficiently distinct from the issues to be decided in the appeal). We agree with the State that "[f]or the best interest of the child and efficiency of

14

the courts, the trial court must maintain prospective jurisdiction to alter support orders when a change in circumstances warrants it." Appellee's Br. p. 10.

Here, however, Mother requested temporary support based on the intermediate appellate decision without waiting for the matter to be recertified to the trial court. Moreover, the trial court did not include in its orders findings that would have supported modification under Indiana Code section 31-16-18-1(b)(1) or (2), and indeed, the trial court told the parties specifically that it was not considering Mother's petition for temporary support as a separate petition to modify child support. Tr. p. 148. Therefore, we do not consider Mother's request to have been a separate and distinct request for support modification.

## II.  Parents' Income and Amount of Support

Father next claims that the trial court's $252.52 weekly child support order was inconsistent with the evidence presented at the hearing. In making this claim, Father contends that the trial court erred in its calculations of both his income and Mother's income and in its calculation of the total amount of weekly child support due.

### A.  Father's Income

Regarding Father's income, the trial court stated that "it is almost impossible to determine the true and accurate income being earned by [Father]" because of how he presents his income information. Appellant's App. p. 43. Nevertheless, the trial court defended its decision to attribute a gross weekly income of $1847 to Father because that amount, although "substantially lower than the State's [worksheet provides] . . . will

reflect what he would have to earn to meet the expenses that he indicates he has." Tr. p. 33. Father claims that the trial court erred by claiming to have arrived at this income amount based on his expenses when in actuality the amount is just an average of the $925 that Father claimed on his child support worksheet and the $2769 alleged by the State. Moreover, Father maintains that because the trial court found that he had $3270 in monthly expenses, he actually needed even less than his claimed $925 per week to meet all of his expenses, and thus, the trial court's imputation of $1847 in gross weekly income to him on the basis of his expenses was clearly erroneous.

Our child support guidelines broadly define weekly gross income "to include not only actual income from employment, but also potential income and imputed income from 'in-kind' benefits." Glover v. Torrence, 723 N.E.2d 924, 936 (Ind. Ct. App. 2000). And in the case of irregular income such as that earned by Father, the guidelines recognize that the calculations necessary to arrive at a just result are "very fact sensitive." Ind. Child Support Guideline 3A, cmt. 2(b). Moreover, the guidelines urge judges and practitioners to "be innovative in finding ways to include income that would have benefited the family had it remained intact, but be receptive to deviations where reasons justify them." Id. To that end, "[a] trial court has wide discretion with regard to imputing income to ensure the child support obligor does not evade his or her support obligation." Miller v. Sugden, 849 N.E.2d 758, 761 (Ind. Ct. App. 2006).

It is apparent that the trial court was well within its discretion to attempt to calculate Father's actual income based upon his expenses. See Glover, 723 N.E.2d at 937

16

(holding that a trial court did not err in imputing income to a father based on his reported expenses, especially in light of "Father's history of under representing his income and the large discrepancy between his reported income and his expenses"). The question remains, however, whether the evidence supports the amount at which the trial court arrived. Father is correct that $1847 is the average of the $925 that Father claimed to be his income and the $2769 that the State had attributed to him in its worksheet. But it does not necessarily follow that this amount was not supported by evidence in the record.

Contrary to Father's assertions, the trial court did not actually find that he had only $3270 in monthly expenses but rather that Father's claimed expenses totaled "in excess of $3270." Appellant's App. p. 32 (emphasis added). In fact, Father's financial declaration listed monthly expenses totaling $3,211.19 and weekly expenses, including weekly court-ordered child support for his prior children, of $238.02. Ex. A. Converting Father's separately listed weekly expenses into monthly expenses, we arrive at additional monthly expenses of $1,023.49. Thus, according to Father's own financial declaration, his regular monthly expenses equaled $4,234.68. Moreover, Father admitted to having additional expenses at the May 25, 2012 hearing that he had left off of his financial declaration, including additional food costs of up to $300 per month, taking his children to the movies, and taking a $5000 vacation within the six months prior to the hearing. Tr. p. 51, 60, 103-04.

Under these circumstances and taking into consideration the trial court's finding that it is "almost impossible to determine" Father's true income, appellant's app. p. 43,

we cannot now conclude that the trial court erred by arriving at Father's income by averaging the amount Father claimed to be his income and the amount attributed to him by the State. See Elliott v. Elliott, 634 N.E.2d 1345, 1349 (concluding that a trial court did not err in imputing income to a father above what he reported on his child support worksheet when there was evidence that the father may not have reported all of his income); see also Walters v. Walters, 901 N.E.2d 508, 513-14 (Ind. Ct. App. 2009) (upholding the trial court's calculation of a mother's income seemingly based on an average of the amounts alleged by both parties).

### B. Mother's Income

Regarding Mother's income, Father claims that the trial court was without an adequate basis to arrive at a weekly gross income amount of $379 for Mother because Mother failed to provide any evidence during the hearing to support the business expenses that she claimed on her financial declaration and because she did not sign the child support worksheet submitted on her behalf by the State. Moreover, Father argues that the trial court erred by giving Mother credit for child care expenses. Finally, Father argues that the trial court should have imputed additional income to Mother because she has the potential to earn $70,000 per year.

There is some support for Father's contention that a trial court may not base an award of child support on an unsigned and unverified child support worksheet. In Cobb v. Cobb, this Court reversed a trial court's modifying child support when the order "could only have been based on [the father's] unsigned and unverified worksheet . . . , which

18

contradicted his trial testimony as to his income." 588 N.E.2d 571, 574-75 (Ind. Ct. App. 1992). However, in this case, the trial court's determination of Mother's income was supported, rather than contradicted, by evidence in the record.

More specifically, Mother testified at the May 25, 2012 hearing that she owns two businesses and earns "roughly $20,000.00 a year." Tr. p. 155, 158. In 2011, Mother earned $22,000 in total gross income and had about $4000 in related business expenses. Tr. p. 158-59.

Mother also signed and submitted both a child support worksheet and a financial declaration. The worksheet, which Mother submitted at the hearing, indicated a weekly gross income of $461.54, but it did not specifically indicate whether Mother had deducted any business expenses from that amount. Ex. 3. Mother's worksheet did not request a reduction for work-related child care expenses and indeed, she indicated at the hearing that she was not requesting that deduction to be included in her request for temporary support. Id.; Tr. p. 154. Mother's financial declaration, which she submitted after the hearing, provided for weekly self-employment gross income of $423 and weekly child support income of $125 for her subsequent-born child, as well as deductions totaling $169. Appellant's App. p. 167. The final sum of these figures equaled $379, which the State used as Mother's gross weekly income in the worksheet it submitted and which the trial court also adopted as Mother's gross weekly income amount on the worksheets it created. Id. at 37, 39-40.

Our child support guidelines define weekly gross income from self-employment as "gross receipts minus ordinary and necessary expenses." Ind. Child Support Guideline 3(A)(2). Additionally, the guidelines provide that "[i]ncome statements of parents shall be verified with documentation of both current and past income." Ind. Child Support Guideline 3(B)(2). However, the commentary to Guideline 3(B) states that "[t]he requirement of income verification is not a change in the law but merely a suggestion to judges that they take care in determining the income of each party." Id., cmt. 2.

Using the $379 per week figure that the trial court adopted as Mother's gross weekly income, Mother would have an annual income of $19,708. This amount was clearly supported by Mother's testimony that she earns approximately $20,000 per year and that in the previous year, her weekly gross income for child support purposes (gross receipts less business expenses) would have been $18,000. Although Mother did not offer independent evidence of her expenses, we conclude that the decision of whether to require such verification is a matter within the sound discretion of the trial court because it inherently involves a question of witness credibility. While it may be better practice to require such independent evidence, here we do not find it to have been an abuse of discretion for the trial court to have foregone the suggestion.

In a related argument, Father contends that the trial court erred by "at least partially" allowing Mother a credit for work-related child care expenses, especially when this issue was part of Mother's appeal. Appellant's Br. p. 17. First, although work-related child care expenses were an issue in Mother's appeal, we reiterate that the trial

20

court was once again vested with jurisdiction to reconsider this issue prospectively as of the date of its final, written orders.[6]

Second, Guideline 3(E)(1) provides that reasonable child care costs "incurred due to employment or job search" should be added to the basic child support obligation and then deducted from the child support obligation of the parent who pays for the child care. Thus, these costs are not to be deducted directly from a parent's employment compensation to arrive at the parent's gross weekly income.

The trial court found that "[Mother's] financial declaration indicates that she has work-related [child care] expenses in the sum of $78 a week" but that "[n]either support worksheet shows that expense." Appellant's App. p. 32. The trial court then created two worksheets on its own, with both attributing gross income to Mother in the amount of $379 per week but only one of the worksheets showing that Mother has work-related child care costs of $78 per week.

We note that it appears that the State's adoption of $379 as Mother's gross weekly income appears to be based on Mother's financial declaration, which indeed included a $78 deduction for child care expenses. Appellant's App. p. 167. However, the trial court specifically found that the State's worksheet did not include a credit for work-related child care expenses. Thus, the trial court may have accepted $379 as Mother's gross weekly income notwithstanding any deduction or credit for child care expenses included

---

[6] During Mother's appeal, this Court determined that the trial court had not erred by refusing to allow Mother to take a work-related child care costs deduction for J.B.J. because Mother works from home and was able to watch her other son simultaneously, so it followed that Mother could do the same for J.B.J. D.C. v. J.J., memo op. at *9.

21

in Mother's financial declaration. Indeed, as discussed above, there was independent evidence supporting a finding that Mother's weekly gross income was $379 even without the child care expense deduction. Thus, this argument fails.

Father's final argument related to Mother's income asks us to find that the trial court erred by not imputing potential income to Mother. However, this is merely a request to reweigh the evidence, which we may not do. In sum, we conclude that the trial court's determination that Mother's weekly gross income was $379 was not clearly erroneous.

### C. Calculation of Support

Father next maintains that "it is unclear how the court arrived at a figure of $252.52 other than Mother's request that support be $250 per week." Appellant's Br. p. 17. Indiana Child Support Rule 2 provides for "a rebuttable presumption that the amount of the award which would result from the application of the Indiana Child Support Guidelines is the correct amount of child support." However, "[a] trial court may, in its discretion, deviate from the presumptive amount specified by the guidelines if application would result in an unjust award." Cobb v. Cobb, 588 N.E.2d 571, 574 (Ind. Ct. App. 1992). In such a situation, the trial court "must set forth a written finding stating the factual basis for the deviation." Hamiter v. Torrence, 717 N.E.2d 1249, 1253 (Ind. Ct. App. 1999) (citing Guideline 3(F)). We will affirm a trial court's order of child support, including an order modifying child support, unless the order is clearly erroneous. McGinley-Ellis, 638 N.E.2d at 1252.

22

Here, the trial court had five child support worksheets before it—one submitted by Father, one by Mother, one by the State, and two created by the trial court. Ex. 3; Appellant's App. p. 35-40. These worksheets provided for a range of weekly child support obligations between $95, in the case of Father's worksheet, to $278.77, as provided by the first worksheet created by the trial court. Appellant's App. p. 35, 39. However, the trial court did not specifically adopt any of these child support worksheets. Therefore, it appears that the trial court found that none of these worksheets provided a just award of child support and chose to deviate accordingly.

As acknowledged by Father, one possible explanation for the trial court's deviation is that Mother had requested an award of at least $250 so that she could maintain her current residence and meet other obligations. This explanation has some support in the trial court's order, which states in part: "[Mother] stated that when [Father] was complying with the Court's Order and paying $149 regular support plus $100 towards the arrearage she was able to provide for the parties [sic] minor child. She asked that support be temporarily modified to $250 per week." Appellant's App. p. 33.

In fixing an amount of child support, the trial court "must consider the children's needs and the parent's general economic condition as it affects the parent's ability to financially provide for the children." Elbert v. Elbert, 579 N.E.2d 102, 112 (Ind. Ct. App. 1991). Thus, to the extent that the trial court deviated from the presumptive child support amount to arrive at a figure that would allow Mother to continue living in her home and

23

provide for the parties' minor child to maintain a certain standard of living, we cannot say that the trial court erred.

### III. Incarceration for Contempt and Appropriateness of Bond for Future Support

Next, Father challenges the contempt finding and contends that the trial court erred by ordering his incarceration for thirty days when at the time of the order he was current on his support obligation. Father further contends that it was error for the trial court to set a bond amount requiring Father to pay six months of his future support obligation in advance.

We will reverse a trial court's finding of contempt only if there is no evidence or reasonable inferences supporting the finding. Cowart v. White, 711 N.E.2d 523, 531 (Ind. Ct. App. 1999). Additionally, it is well-settled that a trial court may use incarceration as a contempt sanction for a parent's failure to pay child support so long as the parent has the financial ability to comply with the order and the delinquency is willful. Pettit v. Pettit, 626 N.E.2d 444, 445 (Ind. 1993).

In the instant case, Mother presented evidence on her contempt petition on May 25, 2012, and the parties reconvened on June 14, 2012, for the trial court's decision. At that time, the trial court noted that Father had previously been found in contempt of court three times for the failure to pay his child support timely and consistently but that no coercive measures had ever been ordered against Father. Tr. p. 169-70. The trial court further found that, despite Father's claims otherwise, Father had the financial means to pay support as ordered "because [he] had it for vacations and for other expenses that he

did pay rather than paying support." Id. at 172. Accordingly, the trial court determined that Father's failure to pay was willful and wanton and that "without coercive measures [Father] will not obey the Court's order as it pertains to consistent payments of weekly child support." Appellant's App. p. 44.

The trial court found Father in contempt of court for his failure to pay support consistently from the time of the last contempt finding until the May 25, 2012 hearing and ordered Father to serve thirty days in the Hamilton County Jail "to impress upon [him] the importance of paying consistent weekly child support." Id. The trial court also ordered Father to post a $6070 bond "to take care of [Father's] support obligations while he is ramping up his new business." Tr. p. 173.

Father contends that the trial court erred by finding him in contempt and ordering him incarcerated because, among other things, Father presented evidence that he had worked a second job, moved into a cheaper apartment, sold some of his assets, and was considering filing bankruptcy. Appellant's Br. p. 19. In other words, Father asks us to reweigh the evidence regarding his financial ability to pay child support as ordered. This we will not do. Moore v. Liggins, 685 N.E.2d 57, 65 (Ind. Ct. App. 1997). Sufficient evidence existed to support the trial court's contempt finding, and we will not set it aside.

Father also fails to persuade us that the trial court erred by failing to allow him to purge his contempt via the support payments he made between the May 25, 2012 hearing and the trial court's pronouncement of its decision on June 14, 2012. In Marks v. Tolliver, this Court emphasized that "the primary purpose of a civil contempt proceeding

25

is not to punish the contemnor but to coerce action for the benefit of the aggrieved party" before reversing an order that called for a father's incarceration at any future time that his child support payments fell behind without an inquiry into his ability to pay at that time. 839 N.E.2d 703, 707-08 (Ind. Ct. App. 2005). The Marks Panel also stated, "[O]ne who is held in civil contempt for failing to pay support should be ordered to pay the total arrearage and given an opportunity to purge himself or herself of contempt by paying the amount owed." Id. at 707.

Although we acknowledge the policy rationale behind the above-quoted language, we conclude that the present case is sufficiently distinguishable from Marks to warrant a deviation from its strict application. Unlike in Marks, the trial court here did not order Father's incarceration at some unknown time in the future without inquiry into his ability to pay at that time. Rather, extensive evidence was presented by both sides regarding Father's ability to pay, and the trial court found that Father had willfully disobeyed the support order. Moreover, the trial court specifically stated that the purpose of its order was to coerce future compliance from Father even though at the time of the order Father was current on his support obligation.

Thus, it is apparent that Father was afforded numerous opportunities over a period of several years to strictly comply with the child support order, and he was repeatedly warned that his failure to do so could result in incarceration. Appellant's App. p. 41-42, 85. Yet despite multiple findings of contempt, Father has never suffered any adverse consequences. Id. Rather, Father has continued his pattern of accumulating arrearages

on his child support obligation. Id. at 42, 80-81. We have held that "[t]he regularity and continuity of court decreed support payments are as important as the overall dollar amount of those payments." Matson v. Matson, 569 N.E.2d 732, 733 (Ind. Ct. App. 1991). For all these reasons, we find no error with the trial court's decision not to allow Father to once again avoid incarceration for his contempt.[7]

Father next contends that the trial court erred by ordering him to post a bond that required him to pre-pay six months of future support. Father alleges that "[p]anels of this court have consistently found that prospective payments . . . are considered gratuities and have long held that 'child support payments cannot be applied prospectively to support not yet due at the time of the overpayment.'" Appellant's Br. p. 21 (quoting Matson, 569 N.E.2d at 733).

Father's argument fails to take into account Indiana Code sections 31-16-6-5 and 31-16-8-3, which specifically state that a trial court entering or modifying an order for child support "may provide . . . for such security, bond, or other guarantee that is satisfactory to the court to secure the obligation to make support payments." These statutes allow for trial courts to be creative in fashioning guarantees of future support where it appears that a parent may not voluntarily pay support as ordered. See Griswold

---

[7] The State concedes that because Father was not provided with a written rule to show cause and the hearing at which Father was incarcerated was a compliance hearing rather than a contempt hearing, "[t]he unorthodox procedure adopted by the trial court did not clearly insure that [Father] received due process." While these procedures are generally required before a trial court can hold a person in indirect contempt, here we believe that strict compliance with these procedures was unnecessary in this case because Father had actual knowledge of the contempt accusations against him and what could happen if he failed to strictly comply with the support order. See In re Paternity of J.T.I., 875 N.E.2d 447, 450 (Ind. Ct. App. 2007).

v. Savage, 569 N.E.2d 970, 972-73 (Ind. Ct. App. 1991) (upholding a trial court's order requiring a parent who often fell behind on his support obligation to deposit $37,500 received from an inheritance into a trust account guaranteeing the payment of future support, college expenses, and medical expenses until the child's expected emancipation at the age of twenty-one). As such, we find no error with the trial court's requirement that Father post a $6070 bond to guarantee that J.B.J. received support while Father was growing his new sales territory.

### IV. Attorney Fees

Finally, Father requests attorney fees. However, Father fails to support his request with cogent argument or any citations to legal authority. Accordingly, Father has waived this request. See Rendon v. Rendon, 692 N.E.2d 889, 898 n.7 (Ind. Ct. App. 1998) (finding that a party waived her challenge to an award of attorney fees when she failed to present a cogent argument or authority in support of her argument on appeal).

The judgment of the trial court is affirmed.

MAY, J., and MATHIAS, J., concur.