**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 30 2013, 5:22 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE:

**KATHRYN HUFFER**
Naples, Florida

ATTORNEY FOR APPELLEE:

**WILLIAM O. HARRINGTON**
Harrington Law Office, P.C.
Danville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF | ) | |
| KATHRYN Y. HUFFER and | ) | |
| CHARLES C. DORTON, | ) | |
| | ) | |
| KATHRYN Y. HUFFER, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 32A01-1212-DR-583 |
| | ) | |
| CHARLES C. DORTON, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Robert J. Lowe, Special Judge
Cause No. 32D05-0706-DR-67

**August 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

Kathryn Y. Huffer (Mother) appeals modification of child support for her children with Charles C. Dorton (Father). Mother presents multiple issues for our review, which we consolidate and restate as:

1.  Whether the evidence supports the trial court's findings regarding Father's income;

2.  Whether the evidence supports the trial court's findings regarding Mother's income;

3.  Whether the trial court erred when it modified Father's child support obligation; and

4.  Whether the trial court erred when it retroactively applied the reduction of Father's child support.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother and Father married on November 30, 1996. Two children were born of the marriage – G.D., born July 13, 1998, and R.D., born March 28, 2001. Mother and Father divorced on December 3, 2003. As part of the stipulated dissolution decree, the court granted Mother full legal and physical custody, and granted Father parenting time pursuant to a shared parenting time schedule to which both parties agreed. The court also ordered Father to pay $650.00 a week in child support and maintain healthcare coverage for the children.

On July 18, 2005, Father filed a petition to modify child support and parenting time, arguing Mother's enrollment in college and the children's enrollment in private school

negated the need for an in-home nanny, and thus there was a significant change in circumstances requiring a modification of Father's child support obligation. On January 24, 2006, Mother filed a cross-petition to modify child support, arguing her enrollment in college caused her income to be reduced and resulted in additional childcare and schooling expenses. After hearings on the competing motions, the court declined to modify child support.

On March 31, 2009, Mother filed a verified notice of intent to relocate to Naples, Florida, because Mother planned to attend the Ave Maria Law School, which had provided Mother with a $25,000.00 scholarship. On the same date, the parties filed a Relocation Agreement[1] in which both agreed to Mother's relocation and to modification of Father's parenting time. The parties did not modify child support as part of their agreement, though Father agreed to pay half of the additional costs of exercising parenting time with the children after they moved to Naples.

On January 20, 2012, Father filed a petition to modify custody and child support. The court held a hearing on the matter on May 30, 2012, and granted Mother's request to transfer the custody matters to Collier County, Florida, where Mother and children reside. The support matter remained in Hendricks County. On September 25, Mother filed a motion for special findings and conclusions of law on the child support issue, which the Hendricks

---

[1] While both parties cite the Appellant's Appendix as the location of this agreement, some of the pages referenced, specifically pages 40 and 41, are not in the Appellant's Appendix. While we were able to discern the contents of the order from what exists of the rest of the agreement, the missing pages hindered our review of the record, and we remind Mother that even a *pro se* litigant is required to observe the Indiana Rules of Appellate Procedure. *See* Ind. Appellate Rule 50(B)(2)(f) (The Appellant's appendix shall contain "pleadings and other documents from the Clerk's Record in chronological order that are necessary for resolution of the issues raised on appeal.").

County court granted. The court held a hearing on October 19, 2012, on the child support issue, and requested proposed findings of fact and conclusions of law from both parties. The court entered an order on November 26 that reduced Father's child support obligation to $474.00 per week and ordered that modification as of January 20, the date Father filed his petition for modification. The court found Father overpaid Mother $7,392.00 in child support while the modification proceedings were pending and, therefore, reduced Father's modified child support obligation by $50.00 until the overpayment credit was exhausted. This appeal ensued.

## DISCUSSION AND DECISION

We first note Mother proceeds in this appeal *pro se*. A litigant who proceeds *pro se* is held to the same established rules of procedure that trained counsel is bound to follow. *Smith v. Donahue*, 907 N.E.2d 553, 555 (Ind. Ct. App. 2009), *trans. denied*, *cert. dismissed*. One risk a litigant takes when she proceeds *pro se* is that she will not know how to accomplish all the things an attorney would know how to accomplish. *Id.* When a party elects to represent herself, there is no reason for us to indulge in any benevolent presumption on her behalf or to waive any rule for the orderly and proper conduct of her appeal. *Foley v. Mannor*, 844 N.E.2d 494, 502 (Ind. Ct. App. 2006).

Where, as here, a party requested findings and conclusions under Indiana Trial Rule 52(A), our standard of review is well-settled. We must determine first whether the evidence supports the findings and, second, whether the findings support the judgment. *Maxwell v. Maxwell*, 850 N.E.2d 969, 972 (Ind. Ct. App. 2006), *reh'g denied*, *trans. denied*. We will

4

disturb the judgment only where there is no evidence supporting the findings or the findings do not support the judgment. *Id.* We do not reweigh the evidence, and we consider only the evidence favorable to the judgment. *Id.* The appellant must establish the findings are clearly erroneous, which occurs only when a review of the record leaves us firmly convinced a mistake has been made. *Id.* We defer substantially to findings of fact, but we do not defer to conclusions of law. *Id.* A judgment is also clearly erroneous if it relies on an incorrect legal standard. *Id.* When a party requests findings and conclusions, a trial court is required to make complete special findings sufficient to disclose a valid basis under the issues for the legal result reached in the judgment. *Id.* The purpose of Rule 52(A) findings and conclusions is to provide the parties and reviewing courts with the theory on which the case was decided. *Id.*

1. Findings Regarding Father's Income

In modifying Father's child support obligation, the trial court made detailed findings regarding Father's income:

> 3. Under the terms of the [Dissolution] Decree, Father was ordered to pay Mother child support in the amount of $650.00 per week (hereinafter, the "Current Child Support Order"). A Child Support Obligation Worksheet, signed by both Mother and Father, was part of the Decree. It showed weekly gross income of $3,462.00 for Father and $500.00 for Mother as of December 3, 2003.
> * * * * *
> 4. The Current Child Support Order has never been modified. However, Father filed a previous request for modification in 2005. After a contested hearing in Hendricks Superior Court No. 3, Judge Karen M. Love presiding, the Court issued an Order on February 22, 2006 denying the request. In said Order the Court found Father's weekly gross income to be $3,875.00 and imputed $400.00 per week to Mother.
> * * * * *

5

13. Father is the sole shareholder and President of KC Copy, Inc. (hereinafter, "KC Copy"). KC Copy is a subchapter-S corporation. KC Copy is a PIP printing franchise located in Avon, Indiana. This is the same business which he owned and from which he derived his income in 2003 [when the original dissolution decree was entered].

14. In 2009, KC Copy paid Father a salary in the amount of $39,988.00. Father received a K-1 from KC Copy in 2009 in the amount of $66,382.00, reflecting the net profit from the operation of KC Copy in 2009. The total of Father's non-passive income (K-1 plus non-passive loss plus Section 179 depreciation) from KC Copy in 2009 was $75,884.00.

15. In 2010, KC Copy paid Father a salary in the amount of $39,980.00. Father received a K-1 from KC Copy in 2010 in the amount of $45,060.00, reflecting the net profit from the operation of KC Copy in 2010. The total of Father's non-passive income (K-1 plus non-passive loss plus Section 179 depreciation) from KC Copy in 2010 was $109,716.00.

16. In 2011, KC Copy paid Father a salary in the amount of $43,487.00. Father received a K-1 from KC Copy in 2011 in the amount of $33,252.00, reflecting the net profit from the operation of KC Copy in 2011. The total of Father's non-passive income (K-1 plus non-passive loss plus Section 179 depreciation) from KC Copy in 2011 was $92,487.00.

17. At the time that Father filed the Pending Motion, Father's 2012 salary from KC Copy was based on $43,487.00 for that year. Later in 2012, Father's salary from KC Copy increased to approximately $60,000.00. Father also receives additional income as a member of the Board of Directors of his local Conservancy District in the amount o[f] $100.00 for each meeting attended. Income from this source totaled $1,400.00 in 2011.

18. Father has been married and divorced and married again since his marriage to Mother ended. As a result of the most recent divorce Father is paying $2,075.00 per month in maintenance for a period of five years from August, 2011. Father's current wife is an employee of KC [C]opy. Because Father's living expenses, including Father's obligation to satisfy the Current Child Support Order, exceed Father's salary, Father has taken distributions from KC Copy, even when KC Copy could not afford for Father to take those distributions.

19. In 2010, Father took excess distributions from KC Copy in the amount of $142,260.00. In 2011, Father took excess distributions from KC Copy in the amount of $97,900.00. The accountant for KC Copy, Jeff Donovan, characterizes these excess distributions as shareholder loans

6

receivable. Father has executed Promissory Notes reflecting that these excess distributions are loans from KC Copy to Father. As Father is sole shareholder of KC Copy, any legal obligation to repay is illusory, but there could be serious tax consequences if repayment does not occur within the time allowed by IRS rules.

20. In late 2011, KC Copy lost two (2) of its largest customers, which accounted for more than $150,000.00 per year of gross revenue to KC Copy.

21. In 2009, the gross income of KC Copy was $840,946.00. In 2010, the gross income decreased to $717,884.00. In 2011, the gross income of KC Copy increased to $750,010.00. Through August 2012, the gross income of KC Copy was $425,238.00, which annualizes to $637,857.00.

22. KC Copy defaulted on its line of credit to National Bank of Indianapolis in the amount of $50,000.00. Therefore, National Bank of Indianapolis did not renew the line of credit. Father has personally guaranteed that obligation.

23. In 2010, KC Copy borrowed $150,000.00 from National Bank of Indianapolis because KC Copy needed some operating capital. KC Copy still owes National Bank of Indianapolis $88,000.00, which Father has also personally guaranteed.

24. Father has personal credit card debt in the amount of approximately $41,000.00. All of Father's personal credit card accounts have been closed. Father pays $900.00 per month toward a consolidated loan that paid off the credit cards.

25. Father is the 51% owner of Henco Partners, LLC (hereinafter "Henco Partners") the company that owns the real estate and building in Avon, Indiana, where KC Copy is operated (hereinafter, the "Henco Partners Real Estate"). The 49% owner is Dayvon Investments, LLC, a company solely owned by James Tolley (hereinafter, "Mr. Tolley").

26. There are two mortgages against the Henco Partners Real Estate. The total monthly mortgages payment, including real estate taxes, is approximately $6,500.00 (hereinafter, the "Henco Mortgage Payment").

27. KC Copy pays $4,500.00 per month in rent to Henco partners for the use of the building.

28. Under the terms of the Henco Partners Operating Agreement, Father and Mr. Tolley are each obligated to make a capital contribution to Henco Partners in the amount of $1,000.00 per month so that Henco Partners will have the funds necessary to make the Henco Mortgage Payment.

29. Starting in October 2011, Father did not have sufficient income to make his monthly capital contribution to Henco Partners. Since October

7

2011, Mr. Tolley has been making a $2,000.00 per moth capital contribution to Henco Partners, loaning $1,000.00 to Father.

30. Father has never received any income or distribution from Henco Partners. However, the value of his interest in it is obviously increasing as the mortgages on the real estate it owns are paid down.

31. The records from Father's bank accounts show that since at least the fall of 2011, Father has maintained a very minimal, and often negative, balance and regularly incurred overdraft fees. On a regular basis, Father has withdrawn amounts from the checking accounts on a monthly basis greater than the monthly deposits.

32. Through August 4, 2012, Father took distributions from KC Copy in the amount of $39,847.94, which annualizes to approximately $66,840.00.

33. As further evidence of the difficult financial circumstances of KC Copy, through August 4, 2012, Father made short-term loans to KC Copy in the amount of approximately $41,500.00 so that KC Copy would have sufficient cash flow to meet payroll and other obligations. Those short-term loans were repaid by KC Copy within a few days as funds became available. The records of KC Copy refer to those short-term loan repayments as "loan payback[.]"

34. Father has two (2) older children, [S] and [C], and pays their mother $115.00 [a week] in child support. Although the Court Order in that case only requires Father to pay support forty-eight (48) weeks per year, Father pays $115.00 year round. This was the situation at the time of the Decree in 2003, and has remained so.

35. Father pays $642.66 per month in health insurance premium[s] for his four (4) children, including [G.D. and R.D.]. The portion of the premium attributable to [G.D. and R.D.] is $321.33 per month, or $74.73 per week.

36. Father exercises approximately 52 overnights of parenting time per year with [G.D. and R.D.].

37. Because of Mother's relocation to Naples, Florida, Father incurs an average of $1,500.00 per year in travel expense for [G.D. and R.D.] to exercise parenting time with Father. This amount averages to $28.85 per week. However, Father consented to this arrangement, and the agreement approved by the Court did not provide that these travel expenses would affect his child support. Therefore, the Court finds that Father is not entitled to any credit for travel expenses toward his child support.

\* \* \* \* \*

41. Father pays $95.00 per pay period, or $190.00 per month, for the cost of his personal health insurance premiums. KC Copy pays

8

approximately $250.00 per month, or $58.14 per week, for the cost of Father's personal health insurance premiums. This amount should be imputed to Father as "in-kind" income.

42. KC Copy paid $2,338.00 in 2011 for the cell phone that Father uses for work and personal use. Father estimated that 70% of the use is personal. Therefore, KC Copy pays $31.47 per week for Father's personal use of the cell phone. This amount should be imputed to Father as "in-kind" income.

43. The health insurance premiums and cell phone payments are the only regular, personal living expenses of Father that Father concedes are paid by KC Copy. Mother maintains that there is much, much more in the KC Copy list of expenses that should be included as income to Father for purposes of calculating child support (Petitioner's Proposed Findings of Fact and Conclusions Thereon). Indeed, for the most part, the KC Copy expenses appearing on the balance sheets are not backed up by additional receipts or documentation that they are, for purposes of the calculations made here, legitimate deductions from gross receipts.

\* \* \* \* \*

53. The parties submit widely divergent facts and inferences to be drawn from them: Father claims that his weekly income is $2,663.61; Mother [claims] that it is $9,262.60. . . . Father requests support be decreased to $323.45 per week retroactive to January 20, 2012; Mother requests increase to $1,071.00 per week.

54. The nature of the business which is the primary source of Father's income is such that a precise figure for gross weekly income cannot be arrived at by unassailable deduction from indubitably established facts. Nevertheless, for purposes of child support calculation, one must be determined, and there exists much evidence in the record from the most recent hearings and in the Court file going back to at least 2003 (which the undersigned has reviewed and taken judicial notice of), from which to draw a conclusion. The Court particularly notes that Father admits that there exist multiple assumptions about how support may be calculated (10 alternative Proposed Child Support Worksheets comprising Respondent's Exhibit HH), and that his accountant, Jeff Donovan, conceded on cross-examination that Father's real gross income exceeds his stated income for tax purposes and is closer to approximately $200,000.00 per year. After giving consideration to all of this evidence, and after paying particular attention to what may and may not be reasonably considered a necessary business expense or "in-kind" income, the court finds Father's average gross weekly income to be $3,800.00. In doing so, the Court does not doubt the precariousness of Father's present financial position, but finds that the problems he is

9

facing are mostly due to bad personal decisions not relevant to the determination of child support, which is, we must always be reminded, for the benefit of the children.

(App. at 25, 27-34.) Mother argues "it is impossible to determine the basis for the trial court's decision from the findings, namely what the trial court included in Father's income and how it calculated Father's income. The court's stated income for Father should be reversed and refigured according to the evidence on the record." (Br. of Appellant at 15.) We disagree.

For the purpose of determining parental income in accordance with the Indiana Child Support Guidelines, "weekly gross income" is broadly defined:

> 1. *Definition of Weekly Gross Income (Line 1 of Worksheet).* For purposes of these Guidelines, "weekly gross income" is defined as actual Weekly Gross Income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon "in-kind" benefits. Weekly Gross Income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, inheritance, prizes, and alimony or maintenance received from other marriages. Social Security disability benefits paid for the benefit of the child must be included in the disabled parent's gross income.
>
> * * * * *
>
> 2. *Self-Employment, Business Expenses, In-Kind Payments and Related Issues.* Weekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income. These expenditures may include a reasonable yearly deduction for necessary capital expenditures. Weekly Gross Income from self-employment may differ from a determination of business income for tax purposes.

10

> Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses. Such payments might include a company car, free housing, or reimbursed meals.

Ind. Child Support Guidelines 3(A)(1)-(2). The trial court enjoys wide discretion in imputing income to the child support obligor to ensure that he does not evade his support obligation. *Glover v. Torrence*, 723 N.E.2d 924, 936 (Ind. Ct. App. 2000).

The trial court made detailed findings regarding Father's personal and business finances. Mother does not dispute there is evidence in the record to support those findings. She instead argues it is unclear how the trial court used those findings to determine Father's weekly income. To support the trial court's imputation to Father of $3,800.00 in weekly gross income, the court must have determined his yearly income was $197,600. In its findings, the trial court discussed Father's actual yearly income for the past three years, as well as all in-kind payments and disbursements taken from Father's businesses. It noted Father's accountant's testimony that Father's income is near $200,000 per year. Considering Father's income in past years, all of which amounts were well below $200,000.00, the in-kind payments, and Father's accountant's testimony, we cannot find error in the trial court's imputation to Father of $3,800.00 in weekly gross income. *See Ratliff v. Ratliff*, 804 N.E.2d 237, 246 (Ind. Ct. App. 2004) (holding no abuse of discretion when income determined based on the evidence).

2.      Findings Regarding Mother's Income

In modifying Father's child support obligation, the trial court made detailed findings

11

regarding Mother's income:

3. Under the terms of the [Dissolution] Decree, Father was ordered to pay Mother child support in the amount of $650.00 per week (hereinafter, the "Current Child Support Order"). A Child Support Obligation Worksheet, signed by both Mother and Father, was part of the Decree. It showed weekly gross income of $3,462.00 for Father and $500.00 for Mother as of December 3, 2003.

* * * * *

4. The Current Child Support Order has never been modified. However, Father filed a previous request for modification in 2005. After a contested hearing in Hendricks Superior Court No. 3, Judge Karen M. Love presiding, the Court issued an Order on February 22, 2006 denying the request. In said Order the Court found Father's weekly gross income to be $3,875.00 and imputed $400.00 per week to Mother.

* * * * *

7. In 1998, Mother earned $18.00 per hour or $720.00 per week.

8. Mother has not worked on a full-time basis since 2006.

9. Mother attended Indiana University-Purdue University Indianapolis from the fall of 2006 through May 2009, when she graduated with a B.A. in Communication Studies. Mother graduated with Highest Distinction and a G.P.A. of 3.91/4.00.

10. Mother moved to Naples, Florida, during the summer of 2009 with [G.D. and R.D.]. Father agreed to this move, though he believes that he was promised that they would all move back in three years.

11. Mother commenced her first year of law school at Ave Maria Law School in Naples, Florida, in August 2009. Mother received a $25,000.00 per year scholarship. Mother lost her scholarship because she failed to maintain a G.P.A. of 3.0. Although the law school gave Mother a second chance to retain her scholarship, Mother again failed to maintain a G.P.A. of 3.0. After Mother lost her scholarship, she took a leave of absence from the law school with intent to return. Mother should have graduated from law school in May 2012. However, due to her two semesters of absence, she is not scheduled to graduate from law school until May 2013.

12. Mother is currently self-employed. She owns and operates a wedding business called Beach Promises, LLC. In 2011, Mother's gross [annual] income from her wedding business was $1,423.00. In 2012, Mother's current gross weekly income from the operation of her wedding business is $164.49 per week. The work is part time with flexible hours. She has minimal assets and approximately $150,000.00 in student loan debt. However, she is able to devote significant time to

volunteer work for her church, and testified that she contributes $564 per month to it.

* * * * *

39. Mother has incurred travel expenses to attend the Hearing in the amount of $986.17. However, these are a direct result of her choice to relocate to Florida.

40. Mother has incurred attorney fees related to the Pending Motion in the amount of approximately $4,000.00. Additional attorney fees incurred in the amount of approximately $6,000.00 are attributable to the pending petition for modification of custody. Due to her economic circumstances, it will be very difficult to pay these fees.

* * * * *

44. Mother did not make a claim for child and dependent care expenses on her 2011 form 1040.

45. For four (4) months and two (2) weeks during 2012, Mother paid approximately $10.00 per week in child care expense for [R.D.] due to Mother's class schedule in law school.

46. However, at the last hearing Mother reported a problem that [R.D.] had at school during the week of October 8, 2012 leading her to believe that she cannot be trusted left alone. Father agrees that she should not be left alone. Mother testified that she will now be forced to hire child care and that will cost $199.00 per week.

47. Since the beginning of the 2012-2013 school year, [R.D.] has walked approximately one (1) mile each direction to get to and from school. [R.D.] gets out of school at 4:05 p.m.

48. Mother has law school classes only three (3) days per week: Monday, 9:30 a.m. to 3:15 p.m.; Wednesday, 9:30 a.m. to 5:15 p.m., and Thursday, 3:20 p.m. to 5:50 pm. The law school is only ten (10) minutes from Mother's apartment in Naples, Florida.

49. [G.D.] is fourteen (14) years old and capable of providing short-term care for [R.D.].

50. There are only two (2) days each week, Wednesday and Thursday, when Mother is not home from law school when [R.D.] gets home. Mother arrives home less than two (2) hours later than [R.D.] on each of those two (2) days.

51. [G.D.] has marching band on Tuesday and Thursday from 6:00 p.m. to 8:15 p.m. Therefore, on both Wednesday and Thursday, [G.D.] is capable of being at home to watch [R.D.] until Mother arrives home.

52. The evidence does not support a finding that Mother is incurring work-related child care expenses with respect to [G.D.] and [R.D.] in the amount of $199.00 per week. The Court finds that a reasonable amount for child care expense for child support purposes is $50.00 per week.

13

53. The parties submit widely divergent facts and inferences to be drawn from them: . . . Mother claims that the appropriate weekly income figure for her is her actual average income of $164.49; Father claims that the greatest amount she earned while working full time ($720.00) should be imputed to her.

\* \* \* \* \*

55. Mother is voluntarily underemployed because she elected to attend law school instead of pursuing full-time employment. On the other hand, she is investing in her financial future and that of her children by pursing a law degree. Further, whatever the moral value of contributing money and volunteer time to charity may be, the Court notes that her first financial obligation is to her children. For the purposes of calculating child support, the Court attributes to Mother a gross weekly income [of] $290.00 per week, based upon minimum wage.

(Appellant's App. at 25-27, 31-34.) Mother argues the trial court erred when it imputed to her additional income because she is not underemployed, and even if she is, she is not so without just cause because she has been pursuing her law degree in lieu of obtaining full-time employment. We disagree.

Indiana Child Support Guideline 3(A)(3) states, in relevant part:

If a court finds that a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and vocational training, the facts of the case may indicate that Weekly Gross Income be set at least at the federal minimum wage level.

"The guidelines give the trial court wide discretion to impute potential income to a parent when the trial court is convinced the parent's unemployment or underemployment has been contrived for the sole purpose of evading support obligations." *Turner v. Turner*, 785 N.E.2d 259, 265 (Ind. Ct. App. 2003). "Where a parent is unemployed or underemployed for a

14

legitimate purpose other than avoiding child support, there are no grounds for imputing potential income." *Trabucco v. Trabucco*, 944 N.E.2d 544, 550 (Ind. Ct. App. 2011), *trans. denied*. While it is true the trial court did not explicitly state Mother's underemployment was for the sole purpose of avoiding child support, the commentary to Ind. Child Supp. Guideline 3(A)(3) directs the trial court to consider:

> When a parent has some history of working and is capable of entering the work force, but voluntarily fails or refuses to work or to be employed in a capacity in keeping with his or her capabilities, such a parent's potential income should be determined to be a part of the gross income of that parent. The amount to be attributed as potential income in such a case would be the amount that the evidence demonstrates he or she was capable of earning in the past.

In the instant case, the trial court's finding that Mother was underemployed because she chose to pursue a law school degree, which the court noted was a worthy endeavor, was offset by Mother's choice to volunteer and donate a large sum of her monthly earnings to charity. Mother reported an income of $164.49 per week, and also reported she donates $564 per month, or approximately 86% of her total monthly income, to charity. Mother has an undergraduate degree with high honors and a Florida teaching certificate, and Father presented evidence she had in the past earned $18 per hour. As the court notes, "her first financial obligation is to her children[,]" (App. at 34), and we cannot find an abuse of discretion in the court's determination that Mother attempted to avoid her child support obligation by volunteering at church rather than obtaining paid employment. The trial court did not err in imputing income to Mother consistent with the Indiana Child Support Guidelines. *See In re Marriage of Turner v. Turner*, 785 N.E.2d 259, 264 (Ind. Ct. App.

15

2003) (no abuse of discretion where evidence supported court's decision to impute income).

### 3. Modification of Father's Child Support Obligation

Appellate courts give considerable deference to trial court findings in family law matters. *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005). We recognize the trial judge "is in the best position to judge the facts, to get a feel for the family dynamics, to get a sense of the parents and their relationship with their children -- the kind of qualities that appellate courts would be in a difficult position to assess." *Id*. Appellate decisions that modify the trial court's decision are especially disruptive in the family law setting. *Id*.

Child support calculations are made utilizing the income shares model set forth in the Indiana Child Support Guidelines. *McGill v. McGill*, 801 N.E.2d 1249, 1251 (Ind. Ct. App. 2004). These Guidelines apportion the cost of supporting children between the parents according to their means. *Id*. A calculation of child support under the Guidelines is presumed valid. *Id*. Therefore, we will not reverse a support order unless the determination is clearly against the logic and effect of the facts and circumstances. *Id*. When reviewing a child support order, we do not assess credibility or re-weigh evidence; we confine our review to the evidence and reasonable inferences therefrom favorable to the trial court's decision. *Id*.

Father, as the party requesting modification of child support, bears the burden of proving modification is appropriate. *Saalfrank v. Saalfrank*, 899 N.E.2d 671, 675 (Ind. Ct. App. 2008). Pursuant to Ind. Code § 31-16-8-1(b), child support may be modified only:

> (1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or

16

(2) upon a showing that:

    (A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and

    (B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

Mother argues modification is not appropriate pursuant to Ind. Code § 31-16-8-1(b)(2), because Father, the party requesting the modification, had not been ordered by the court to pay more than 20% more support than what would be required under the Indiana Child Support Guidelines. In addition, she contends Father did not demonstrate "changed circumstances so substantial and continuing as to make the terms [of the child support order] unreasonable." Ind. Code § 31-16-8-1(b)(1). We disagree.

As stated by our Indiana Supreme Court, Ind. Code § 31-16-8-1(b) is written in the disjunctive in order to provide an avenue for support modification when the amount ordered does not differ by 20% from the Indiana Child Support Guidelines:

> Our interpretation of the Legislature's action in 1997 is that it wanted to provide a bright-line for parents and for courts as to when a parent would be entitled to modification in his or her child support obligation solely on grounds of change in income. The Legislature seems to be saying that if more than a year had passed since the last modification, and one parent's income has changed so much that his or her obligation under the Child Support Guidelines would change by 20%, a parent is entitled to modification. The Legislature left in place the opportunity for a parent to request modification at any time and for any reason so long as - but only if - the parent could show changed circumstances "so substantial and continuing as to make the terms [of the prior order] unreasonable." Ind. Code § 31-16-8-1(1) (2004).
>
> In addition to providing a bright-line test for a parent who seeks modification solely on grounds of change in income, it seems to us that, as a practical matter, the Legislature has effectively established a bifurcated standard for modification, Subsection (2) covering situations where a parent seeks modification solely on grounds of change in income and Subsection (1)

17

covering all other situations (including situations alleging a change in income and one or more other changes). It is true that, as a matter of pure logic, a parent could seek modification solely on grounds of change in income under Subsection (1) - indeed, Father does so here. But we do not believe that the Legislature would consider a change in circumstances standing alone (i.e., without any other change in circumstances) that would change one parent's child-support payment by less than 20% to be "so substantial and continuing as to make the terms [of the prior order] unreasonable." Indeed, it is hard to see the reason the Legislature would have enacted subsection (2) at all if a parent could receive a modification under Subsection (1) where the only changed circumstance alleged would change one parent's payment by less than 20%.

*MacLafferty*, 829 N.E.2d at 941-42. Therefore, Father must prove there were other factors besides his change in income to warrant a modification in child support. *Id*. at 942.

Father presented evidence of changes from the original divorce decree including: Father's income, Mother's income and earning potential, the age of the children, the distance Father was required to travel to exercise parenting time, the frequency with which Father could exercise his parenting time, work-related child care costs, and health insurance premiums for which Father did not receive credit as part of the original child support agreement. Based on this evidence, we cannot say the trial court erred when it modified Father's child support obligation. Father demonstrated a change in circumstances so substantial as to warrant the modification. *See Elbert v. Elbert*, 579 N.E.2d 102, 112-13 (Ind. Ct. App. 1991) (affirming modification supported by change in circumstances, including ages of children, residency, and income).

4. Retroactive Reduction of Father's Child Support Obligation

"A trial court has discretion to make a modification of child support relate back to the date the petition to modify is filed, or any date thereafter." *Becker v. Becker*, 902 N.E.2d

18

818, 820 (Ind. 2009). In *Quinn v. Threlkel*, 858 N.E.2d 665, 674 (Ind. Ct. App. 2006), we held, "Allowing courts discretion in making the modification of child support effective as of the date of the petition is filed may serve to avoid dilatory tactics." *Id*. (quoting *Talarico v. Smithson*, 579 N.E.2d 671, 673 (Ind. Ct. App. 1991)). Mother argues that since there were no such tactics in this particular action, then the trial court abused its discretion when it retroactively modified Father's child support obligation back to the date he filed his petition to modify. However, *Quinn* does not require there be "dilatory tactics" in order for a modification to be applied retroactively, nor will we impute such a limitation on the discretion of the trial court. Accordingly, we hold the trial court did not abuse its discretion when it retroactively applied the reduction in Father's child support obligation to the date on which he filed his petition to modify. *See Becker*, 902 N.E.2d at 820 ("A trial court has discretion to make a modification of child support relate back to the date the petition to modify is filed, or any date thereafter.").

## CONCLUSION

The trial court did not err when it determined the incomes of Mother and Father, reducing Father's child support obligation, or ordering retroactive modification of Father's child support obligation. Accordingly, we affirm.

Affirmed.

BAILEY, J., and BRADFORD, J., concur.

19